Filed 10/5/23  P. v. Amos CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> ROBERT RAY AMOS, <br><br> Defendant and Appellant. | F082941 <br><br> (Super. Ct. No. 2067529) <br><br><br> **OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Stanislaus County.  Shawn D. Bessey, Judge.

Janet J. Gray, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Louis M. Vasquez, Amanda D. Cary and Lewis A. Martinez, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

# INTRODUCTION

Defendant Robert Ray Amos molested Jane Doe 1, Jane Doe 2, Jane Doe 3, Jane Doe 4, and Jane Doe 5 when they were children. Each of the victims came forward and reported the molestations to law enforcement after defendant confessed to his daughter, K.M., that he had been touching her daughter, Jane Doe 6, his granddaughter, on her privates. Defendant was convicted of three counts of lewd and lascivious acts on a child under 14 years of age (Pen. Code, § 288, subd. (a)[1]; counts 1, 3, and 5) with the multiple victims under age 14 allegation found true. The jury was unable to reach a verdict on counts 2 and 4, which were dismissed. Defendant was sentenced to 45 years to life.

Defendant raises several issues in his appeal. First, he claims he received ineffective assistance of counsel when his attorney elicited testimony from the People's expert witness about percentages of children that falsely report molestations. Second, defendant claims the trial court erred by relying on an incorrect standard in denying his *Marsden*[2] motion. Third, defendant claims the expert witness exceeded the scope of his expertise and that his attorney was ineffective for his failure to object. Fourth, that testimony regarding prior uncharged acts of molestation should have been excluded as unfair and prejudicial. Fifth, the trial court erred when it overruled defendant's corpus delicti objection to the pretext call. Sixth, defendant claims the pretext statements were involuntarily made. Seventh, defendant alleges there is insufficient evidence to support the conviction for count 1. And eighth, defendant claims the trial court erred when it instructed the jury with CALCRIM No. 1191. We reject defendant's claims and affirm the judgment.

---

[1] All statutory references are to the Penal Code unless otherwise indicated.

[2] *People v. Marsden* (1970) 2 Cal.3d 118 (*Marsden*).

# FACTUAL BACKGROUND

### A. *Prosecution Case*

#### 1. <u>Jane Doe 1</u>

Jane Doe 1's birthdate is June 7, 1988. Jane Doe 1 first met defendant when she was five years old. Defendant was a friend of her mother. Defendant had two daughters: J., who was about five or six years older than Jane Doe 1, and K.M., who was about two years older. When Jane Doe 1 was around seven years old, she became best friends with K.M. Jane Doe 1 spent a lot of time at K.M.'s house, spent the night and even lived with K.M. for periods of time. Jane Doe 1 said defendant was "like a second dad to me." He took care of her, made her meals, and gave her money to go shopping. Jane Doe 1 said her view of defendant changed after he molested her. This occurred two to three times while defendant was living in an apartment on Chrysler Street. The last time defendant molested Jane Doe 1 was in Mexico.

*Count 1: First Incident*

The first time defendant molested Jane Doe 1, she was 10 or 11 years old. Jane Doe 1 was asleep in a bedroom with K.M. but woke up because she had a headache. Jane Doe 1 told defendant she had a headache and defendant massaged her neck and shoulders to make her headache go away. Jane Doe 1 did not think this was unusual and just thought of it as him caring for her. Jane Doe 1 said they were sitting on the floor with defendant sitting behind her. Defendant slowly moved his hand down her lower back and then said, "I'm sorry." Jane Doe 1 responded "What? What do you mean?" and turned to look behind her. When she turned around she saw defendant's penis was erect and exposed through the hole of his boxer underwear and he had his hand on it. When Jane Doe 1 saw this, she got up and went downstairs. K.M. remained asleep during this incident. Jane Doe 1 told her sisters about the incident and later reported it to law enforcement in 2015.

*Count 2: Second Incident*

The second incident occurred a few months later when Jane Doe 1 was around 10 or 11 years old. Jane Doe 1 and K.M. were both sleeping in a daybed in the bedroom closest to the bathroom. Jane Doe 1 was sleeping on the side of the bed closest to the wall when she was woken up by a hand that was reaching up from underneath the bed and touching her. Defendant was lying underneath the daybed and reaching his arm up between the wall and the bed. Defendant touched Jane Doe 1 on her vagina, over her clothes. She also remembered an incident where defendant touched her vagina underneath her clothes, skin to skin, but could not recall if it was this incident or another incident. She explained that her memories of the incidents were jumbled together. There may have been more than one incident where defendant only touched her thigh. On this incident, Jane Doe 1 was certain defendant touched her on her vagina and that it stopped when she moved and rolled over. Jane Doe 1 recalled that pornography was playing on the television when defendant touched her vagina. K.M. did not wake up and Jane Doe 1 did not tell anyone about this incident until she reported it in 2015.

*Third Incident in Mexico*

When Jane Doe 1 was about 11 or 12 years old, she went with K.M. and defendant on a trip to Mexico to visit defendant's older daughter, J. They stayed the night in a motel that had two beds. Jane Doe 1 and K.M. shared a twin bed; Jane Doe 1 slept on the side of the bed closest to the wall. Jane Doe 1 woke up to defendant's hand reaching up and touching her on her vagina over her clothes. Defendant was laying in the space between the bed and the wall. Jane Doe 1 got up quickly and went into the bathroom and sat in the dark.[3] She did not tell anyone about this incident until 2015 when she reported it to law enforcement.

---

[3] Jane Doe 1 did not tell law enforcement that she went to the bathroom in Mexico, but said she rolled over and went back to sleep. Jane Doe 1 did not have an explanation for the omission except that her memory jumbled a bit. At trial, Jane Doe 1 maintained

4.

After the incident in Mexico, Jane Doe 1 did not spend the night at K.M.'s anymore because she was living with her mom again. Jane Doe 1 remained friends with K.M. The last time Jane Doe 1 saw defendant was around 2006. Jane Doe 1 explained that she reported the abuse to law enforcement in 2015 when she found out defendant had touched his granddaughter, Jane Doe 6. Jane Doe 1 was under the impression that law enforcement could not do anything about what defendant did to Jane Doe 6.

Jane Doe 1 is friends with Jane Doe 2 and Jane Doe 3, Jane Doe 4 is Jane Doe 1's sister, and Jane Doe 5 was Jane Doe 1's stepsister. Prior to reporting the abuse to law enforcement, Jane Doe 1 told Jane Doe 2 and Jane Doe 4 that she was molested by defendant. Prior to speaking with law enforcement in 2015, Jane Doe 1 spoke with other Jane Does and they decided it was time to get justice for Jane Doe 6 and for themselves. When they heard the incidents happened to another little girl, they wanted it to stop. They were upset that defendant was not going to be prosecuted for touching his granddaughter and they wanted him to face justice for what he did. Jane Doe 1 said they did not make up this story in order to get defendant in trouble; she would not lie in order to get justice for Jane Doe 6. Jane Doe 1 wanted to see defendant convicted because of what he did to her.

2.    *Jane Doe 2*

Jane Doe 2's birthday is March 22, 1989. Jane Doe 2 is friends with K.M. and defendant is K.M.'s dad. Jane Doe 2 first met K.M. in 1999 at Jane Doe 1's house and they became best friends. Jane Doe 2 went over to K.M.'s apartment where she met defendant. Jane Doe 2 did not have a relationship with defendant and did not really talk with him. She went to K.M.'s apartment a few times and stayed over two times when she was 10 years old. The first time she stayed overnight, defendant was not there.

---

that after defendant touched her in Mexico she went to the bathroom and sat there for a while in the dark.

*Count 3: First Incident*

The second time Jane Doe 2 stayed over it was for the two nights. The first night she slept in the bedroom closer to the bathroom. The room had a twin bed against the wall, a dresser and a television. She fell asleep in the room with K.M. and defendant, who was sitting on the floor setting up a video game. K.M. was sleeping on the side of the bed closest to the wall and Jane Doe 2 was on the other side. Jane Doe 2 woke up to defendant touching her vagina under her clothes, making skin to skin contact. Defendant was feeling around with his fingers but did not go inside. He was on the floor next to her side of the bed. Jane Doe 2 turned over and he stopped. Jane Doe 2 did not tell anyone and tried to act like nothing happened.

*Count 4: Second Incident*

The second night Jane Doe 2 and K.M. slept in the other bedroom that had a daybed. Jane Doe 2 changed the sleeping arrangements because she did not want defendant to touch her again. This night, Jane Doe 2 asked to sleep on the side of the bed against the wall, thinking defendant could not get to her. Jane Doe 2 woke up to defendant touching her again. Defendant was standing at the end of the bed where Jane Doe 2's feet were and reaching over. Jane Doe 2 said she clearly saw defendant's face both times he touched her.[4] Defendant was feeling Jane Doe 2's vagina with his hand, under her clothes. When Jane Doe 2 woke up, she turned over and he stopped and went away. Jane Doe 2 did not say anything to K.M. at that time.

Jane Doe 2 reported the incidents to law enforcement in 2015 after Jane Doe 1, Jane Doe 3 and Jane Doe 4 had come forward. Jane Doe 2 did not talk with the other

---

**4** Jane Doe 2 said she was mistaken at the preliminary hearing when she said she could not see defendant's face when he touched her. She remembered seeing his face both times he touched her and was not changing her story to strengthen her allegations. Further, Jane Doe 2 said defendant was the only male living in the house at the time of the incidents.

Jane Does about what happened before she spoke with law enforcement. They shared that something had happened to them but did not talk about the details of the incidents. On cross-examination, Jane Doe 2 said she might have told Jane Doe 1 that after each incident she rolled over and went to sleep. Jane Doe 2 is still friends with K.M. and heard that defendant did something to her daughter, Jane Doe 6, but did not know any details about it. Jane Doe 6 is also one of the reasons Jane Doe 2 came forward. She heard that defendant told K.M. he touched Jane Doe 6. She said it was wrong of him to do that and she felt she needed to come forward for herself as well. Jane Doe 2 said she just wanted the truth to come out. Jane Doe 2 said she has a good memory about what happened and denied that anyone implanted this idea in her head.

### 3. *Jane Doe 3*

Jane Doe 3's birthday is June 2, 1995. Jane Doe 3 was eight years old when she met defendant. Defendant's ex-wife was friends with Jane Doe 3's mother and Jane Doe 3 was friends with his stepdaughter K.J. She did not spend any time with defendant and did not have any type of relationship with him. Jane Doe 3 spend time at K.J.'s place on Sutter Street when defendant lived there.

*Count 5*

One day in 2004 defendant asked Jane Doe 3's mother if Jane Doe 3 could spend the night with K.J. Jane Doe 3 was eight or nine years old. Defendant had Jane Doe 3 and K.J. stay with him in his trailer which was parked outside at Jane Doe 1 and Jane Doe 4's grandmother's house. Jane Doe 3 slept in the back bed with K.J. and was woken up with her pants and underwear down and defendant's hands touching her vagina. Jane Doe 3 said she was scared and did not know what to do because she was just a child. She pulled her pants up and defendant pulled her pants and underwear back down and continued to touch her inappropriately. Defendant touched her vagina underneath her clothes with his fingers, rubbing it. She did not remember how it stopped. The next

morning, Jane Doe 3 went home and told her mother what happened, and they spoke with law enforcement right away.  Jane Doe 3 did not discuss the incident with K.M. or any of the Jane Does before reporting it in 2004.

Jane Doe 3 went to the police again in 2015 after hearing what defendant did to K.M.'s daughter.  She was disappointed law enforcement did not do anything about it when she first reported it, saying this never would have happened to Jane Doe 6 if defendant was not let out.  Jane Doe 3 told the police the same things that she reported in 2004.  She did not discuss the details of what defendant did to her with Jane Does 1, 2, 4 or 5 before reporting the incident again in 2015.  Jane Doe 3 is traumatized from the incident and has bad dreams.  It has affected her life.  Jane Doe 3 said this was something she lived with every day of her life and something you never forget.

4.    *Evidence Code Section 1108*

*Jane Doe 4*

Jane Doe 4's birthday is December 6, 1984.  Jane Doe 1 is her sister, Jane Doe 5 is her stepsister, and Jane Doe 2 and Jane Doe 3 are her friends.  Jane Doe 4 said she knew defendant as a family friend and that K.M. and J. were really good friends of hers growing up.  She first met defendant in 1992 when she was eight years old.  Jane Doe 4's father was not around and defendant became like a father figure for her.  Jane Doe 4 remembered spending the night with K.M. and J. at the place on Chrysler street where defendant lived when she was around nine or 10 years old.

The first incident with defendant occurred when Jane Doe 4 was about 13 or 14 years old, and she was sleeping over at defendant's house.[5]  K.M. and Jane Doe 1 fell asleep in one bedroom while Jane Doe 4 and J. were in the other bedroom watching a movie.  Jane Doe 4 fell asleep on the side of the bed closest to the door.  Jane Doe 4 said

---

[5]    Jane Doe 4 told law enforcement in 2005 that she was 14 or 15 years old for the first incident.

8.

she woke up to the feeling of poking and touching on her behind. At first Jane Doe 4 did not do anything, but she continued to feel it. After about a minute, she looked up and saw pornography on the television and looked away. She turned around and saw defendant grabbing her bottom and playing with himself. Defendant had his hand on his exposed penis. Jane Doe 4 got up and left. She went into the room next door where K.M. and Jane Doe 1 were sleeping, locked the door and curled up on the floor next to the bed. Jane Doe 4 did not tell anyone about the incident at that time.

There was another incident with defendant between 1999 and 2001, when Jane Doe 4 was about 15 years old.[6] Jane Doe 4 was staying at one of her mom's friend's houses and was sleeping on the couch in the living room. Jane Doe 4 woke up to find defendant sitting on the floor next to the couch and her pants were undone. She does not know whether defendant touched her on that occasion, but she knows that when she fell asleep her pants were not undone. No one else was in the room when she woke up. Jane Doe 4 told her sister Jane Doe 1 within a few days or a week that there was in incident with defendant.[7]

Jane Doe 4 reported both incidents to law enforcement in 2005 after she found out about Jane Doe 3. She felt guilty because she thought that if she had said something sooner maybe it would not have happened to Jane Doe 3. Before reporting the incidents in 2005, Jane Doe 4 said that she had not discussed what happened with Jane Does 2, 3 or 5. Jane Doe 4 reported these incidents again to law enforcement in 2015. She only told Jane Doe 1 there were a few incidents that happened to her that made her feel uncomfortable.

---

**6**     Jane Doe 4 told law enforcement in 2005 that she was about 15 or 16 years old for the second incident.

**7**     Jane Doe 4 initially testified she did not tell anyone about defendant before reporting the incidents in 2005, but her memory was refreshed by the police report.

*Jane Doe 5*

Jane Doe 5's birthday is December 22, 1993. Defendant was her parents' friend; she knew defendant since she was very young. At one point, when Jane Doe 5 was five or six years old, defendant lived in the shed in the back of their apartment on South Abby for about five to six months. During that time defendant would come in and out of the apartment. A lot of people would come to the apartment to stay, and no one had a designated bed except for her dad and stepmom. Everyone just slept where they dropped. Jane Doe 1 and Jane Doe 4 lived there as well; they were the daughters of Jane Doe 5's dad's ex-wife. She did not know Jane Doe 2 or Jane Doe 3.

The first incident with defendant occurred when she was five years old and had a friend stay the night. Jane Doe 5 and her friend fell asleep on the couch in the living room. Jane Doe 5 woke up and saw defendant watching pornography on the television. Jane Doe 5 closed her eyes and turned her head because she did not want to get into trouble for watching the pornography. Then defendant got up and sat at the edge of the couch where Jane Doe 5 was lying on her stomach. Defendant grabbed one of Jane Doe 5's butt cheeks over her clothing with his hand and shook it, moving back and forth. Jane Doe 5 pretended to be asleep but moved like she was waking up, hoping he would stop. This caused defendant to stop and move to the other couch. Defendant returned to Jane Doe 5 so she turned onto her back so he could not grab her butt. However, defendant grabbed her vagina and shook it, and she regretted turning over. Jane Doe 5 moved again, and defendant went back to the other couch. Jane Doe 5 turned back around so that her butt was showing because she would rather he touch that than the other. Defendant came back and touched her again, then she moved again to get him to stop. Jane Doe 5 said this went on like that for a while. At one point, Jane Doe 5 looked up and their eyes met, and defendant smiled at her like a smirk. Jane Doe 5 then slipped herself under the couch cushions connected to the back of the couch to hide from defendant. But then defendant started to do the same thing to her friend who was asleep

10.

on the couch next to her. Jane Doe 5 tried to pinch her friend's toes to wake her up, but her friend did not wake up. After defendant moved back to the other couch again, Jane Doe 5 slipped out of the couch and went into the bedroom.

Jane Doe 5 told her brother about the incident, but he did not believe her. Jane Doe 5 told her friend who stayed the night about the incident and her friend got upset that Jane Doe 5 left her out there. Jane Doe 5 has no other memory of defendant touching her.

Jane Doe 5 decided to report the incident to law enforcement in 2018 after discovering defendant was in custody; she had been looking through custody reports to find her cousin. Jane Doe 5 discovered that defendant was being accused of child molestation and she decided to report what he did to her. She wanted to help with the case and it inspired her to tell her story. Jane Doe 5 did not talk with Jane Doe 1 or Jane Doe 4 before deciding to report her incident and did not know that something happened to them as well. Jane Doe 5 had not heard about K.M.'s allegation that defendant had done something to Jane Doe 6.

After Jane Doe 5 reported her incident to police she shared her story online for the "Me Too" movement. Jane Doe 1 responded to Jane Doe 5's story and asked Jane Doe 5 who it was. Jane Doe 5 told Jane Doe 1 it was defendant. Jane Doe 1 told Jane Doe 5 that she was a victim too and the one who filed charges against defendant. Law enforcement told Jane Doe 5 her case was past the statute of limitations. A few months ago, Jane Doe 1 asked Jane Doe 5 if she was willing to help in this case by sharing her story and Jane Doe 5 agreed. Jane Doe 5 testified in court to help herself and to help her friend who did not remember what defendant did to her.

Even though she was only five years old when this incident happened, Jane Doe 5 said the incident is a vivid memory for her. Jane Doe 5 was not mistaken or lying about what defendant did to her.

11.

5.    *Pretext Call*

K.M. is defendant's daughter. K.M. lived with her grandmother and her older sister J. at the Prescott Estates apartment; defendant lived at the apartment "[h]ere and there." K.M. met Jane Doe 1 when she was seven years old; Jane Doe 1 is her best friend and spent the night at K.M.'s often. Jane Doe 2 also spent the night at her place. K.M. knew Jane Doe 3 and would babysit her. She also knew Jane Doe 4, who was Jane Doe 1's sister. Jane Doe 4 had spent the night at her house too. K.M. knew Jane Doe 5, but not very well and she never spent the night at her place.

K.M. said that growing up with defendant was terrible. They never had running water or food or lights. Defendant would come and stay when he had nowhere else or come and take K.M. when he did have a place. The apartment had two bedrooms: the one closest to the bathroom had a trundle bed without a bed underneath it and she did not remember whether the other bedroom had a bed. K.M. said she is a very hard sleeper.

K.M. has three children, including Jane Doe 6. In 2014, K.M. was living in Lake County when defendant stayed with her for about six months. Jane Doe 6 was nine years old at that time and K.M. sometimes left Jane Doe 6 with defendant while she worked. In May of 2015, defendant had threatened to commit suicide and K.M. called the police. Defendant called K.M. from the psych ward and told K.M. that he touched her daughter Jane Doe 6 and that he hated himself and he was sorry. K.M. hung up and called the police. With the suggestion from law enforcement, K.M. called the defendant and recorded their conversation. The recording was played for the jury. In the recording, defendant admitted to touching Jane Doe 6 on her privates while she was asleep.

K.M. said she was unaware of any sexual abuse allegations about defendant before this and that defendant never touched her in an inappropriate way. K.M. told Jane Doe 1 that defendant admitted to molesting her daughter and Jane Doe 1 told her it happened to her too. K.M. said she had no idea that defendant had molested Jane Doe 1. Jane Doe 1 did not give K.M. any details about what defendant did to her. K.M. did not tell Jane

12.

Doe 1 that she needed her help to get justice. K.M. did not speak with Jane Doe 2 right away. K.M. spoke with Jane Doe 6 about defendant after the phone call from him. K.M. learned that defendant could not be prosecuted for what happened to Jane Doe 6 because Jane Doe 6 had no recollection of it happening.

6. *Expert Dr. Blake Carmichael*

The court designated Dr. Blake Carmichael as an expert in the behavior of child sexual abuse victims. Dr. Carmichael counsels and educates people on the myths and misconceptions regarding child sexual abuse behaviors. These myths include (1) that the victim of sexual abuse will hate their abuser, (2) that the abusers are strangers, (3) that children of sexual abuse report it immediately, and (4) that a child who was sexually abused will be a great historian as to what happened to them.

Dr. Carmichael stated he does not determine whether claims of sexual abuse are true or false. Dr. Carmichael clarified that he did not know the allegations in this case, let alone have an opinion on whether they are true or false. He did not discuss the facts of the case with the prosecution, nor was he given copies of any police reports or interviews with the victims.

During cross-examination, Dr. Carmichael responded to defense counsel's question that there is a lot of research showing false allegations are rare and that children do not lie about sexual abuse. The percentage of sexual abuse allegations that turn out to be false are "between two and six percent on the high end." For negative events or implausible events like sexual abuse, children do not have any context or cannot relate and so there is far less false reporting or even suggestibility in this area.

Dr. Carmichael agreed that there were old cases in the 1990's that involved groups of people making false allegations. The specific case from the 90's was the "*McMartin* case" which involved a preschool where people were accused of sexually abusing the children. The "*McMartin* case" prompted better interviewing techniques when working

13.

with children because a lot of inappropriate interviewing techniques were used and children at that age are more suggestible.

### B. Defense case

Detective Sean Dodge was assigned to the Special Victims Unit and interviewed Jane Doe 1 on June 16, 2015. Dodge memorialized the interview in his June 30, 2015, police report, which did not indicate Jane Doe 1 said defendant was masturbating or that his hand was touching his penis. After reviewing the transcripts of the interview though, Dodge recalled that Jane Doe 1 did tell him defendant had his hands on his penis. The report did not indicate Jane Doe 1 said she went to the bathroom after defendant touched her in Mexico. However, after reviewing the transcripts of his interview, Dodge recalled that Jane Doe 1 did tell him that after defendant touched her in Mexico, she got up and went to the bathroom.

Detective Dodge also spoke with Jane Doe 3. The police report indicated that Jane Doe 3 said she pulled her pants up and there is nothing in the report indicating defendant pulled her pants down while she was awake. Dodge recalled from his interview with Jane Doe 3 that she told him she woke up to defendant pulling her pants down.

### C. Stipulations

The parties stipulated that, "In June 2015, defendant's Toshiba laptop was forensically analyzed by Officer Duffield of the Lake County sheriff's office. Officer Duffield did not locate[] any documents or images relating to the case involving Jane Doe Six." The second stipulation was that defendant's date of birth is January 5, 1955.

### D. Verdict

Defendant was charged with five counts of committing a lewd and lascivious act on a child (§ 288, subd. (a)). Count 1 was the first incident involving Jane Doe 1 when she was 10 or 11 years of age; count 2 was the second incident involving Jane Doe 1

when she was 11 or 12 years old; count 3 was the first incident involving Jane Doe 2 when she was nine or 10 years old; count 4 was the second incident involving Jane Doe 2 when she was nine or 10 years old; and count 5 was the incident involving Jane Doe 3 when she was eight years old. The information alleged that the victims were under 14 years old and defendant committed the offenses against multiple victims (§667.61, subds. (b), (e), (j)(2)). The information further alleged the statute of limitations was extended pursuant to section 801.1, subdivision (a).

The jury convicted defendant of counts 1, 3 and 5 and found true the multiple victims under age 14 allegations. The jury also found that the statute of limitations was extended pursuant to section 801.1, subdivision (a). The jury was unable to reach a verdict as to counts 2 and 4, which were dismissed. Defendant was sentenced to three consecutive terms of 15 years to life.

## DISCUSSION

I. DEFENDANT FAILS TO DEMONSTRATE HE RECEIVED INEFFECTIVE ASSISTANCE OF COUNSEL WHEN HIS ATTORNEY ELICITED INFORMATION FROM THE STATE'S EXPERT ABOUT THE PERCENTAGE OF FALSE ALLEGATIONS.

Defendant first contends his trial counsel was prejudicially ineffective for eliciting testimony from the State's expert regarding the percentage of false allegations of sexual abuse. The People claim the evidence was helpful to the defense's theme of the case and that regardless, it did not prejudice defendant. We agree that defendant cannot show prejudice and reject the ineffective assistance claim.

*A. Relevant Facts*

The prosecutor asked Dr. Carmichael, "whether it's a myth or misconception that a child always reports the abuse and they report it immediately?" Dr. Carmichael responded that sexual abuse is one of the crimes less frequently reported. Research shows that about 60 to 75 percent of children who are sexually abused do not report it in the first year or until they turn 18 years old. The prosecutor did not ask the expert any

15.

questions about the percentage of false allegations of sexual abuse during direct examination.

During cross-examination, defense counsel asked Dr. Carmichael if it is a "fact that not everyone who says they were molested was really molested." Defense counsel confirmed he was asking about false allegations, to which Dr. Carmichael responded that false allegations are rare, and that research shows children do not lie about sexual abuse. Defense counsel asked, "what percent[age] of sex abuse allegations turn out to be false?" Dr. Carmichael responded, "[d]epending upon which research you look at, the consensus is between two and six percent on the high end." "There are articles that talk about higher false allegation rates, but those are in the context of child custody or child access disputes. And even in those cases, those are made by the adults or the people in the dispute." And "in those studies very few kids [were] making false allegations, again in that almost zero to two to six percent." Dr. Carmichael explained that "for negative events or implausible events, things that people have no context for or can't like really relate to it, we are seeing far less false reporting or suggestibility in that area." Dr. Carmichael agreed there is some false reporting, but that "people can reliably pick out, yeah, that's the one that actually didn't happen." Therefore, false allegations are pretty easy to identify because the confidence level of someone sharing a false memory is quite low.

The defense attorney asked Dr. Carmichael about confabulation and he explained that is when someone cannot remember all the details of an event and fills in the holes by adding information that did not happen. Confabulation tends to occur more in positive or neutral events, and omissions tend to occur in negative or traumatic events.

Defense counsel asked Dr. Carmichael about a case where a group of people made false allegations together. Dr. Carmichael agreed that there were cases in the 90's that reported this, but said that since then there have been decades of improvement in talking with children reporting abuse. Dr. Carmichael specifically discussed the "*McMartin*

case" from the 90's. This case involved people at a preschool who were accused of sexually abusing the children. This case prompted better interviewing techniques when working with children because a lot of inappropriate interviewing techniques were used.

Dr. Carmichael explained he does not determine whether claims of sexual abuse are true or false; he leaves that to the legal system. Dr. Carmichael had studied false allegations and was familiar with Elizabeth Loftus and her research on memory. She has done a lot of the research on plausible and positive events. She explained that it is easier to convince someone of a false memory for plausible and positive or neutral events, but much more difficult for negative or implausible events.

The court instructed the jury that they "alone must judge the credibility or believability of witnesses." "Dr. Blake Carmichael's testimony about child sexual abuse victims is not evidence that the defendant committed any of the crimes charged against him. You may consider this evidence only in deciding whether or not a Jane Doe's conduct was not inconsistent with the conduct of someone who has been molested and in evaluating the believability of her testimony."

In closing statements, the prosecutor referred to the expert's testimony about false allegations of sexual abuse. The prosecutor reminded the jury that Dr. Carmichael said false allegations are very rare and "[m]ost kids do not lie about sexual abuse." And incorporated the evidence into the PowerPoint presentation. The prosecutor also recalled that Dr. Carmichael said, "two to six percent is on the high end and most of those involve child custody disputes." And that the expert explained it is highly unlikely to implant a false memory regarding a negative or traumatic event, which would include child molestation. The prosecution also noted the expert opined that someone is less likely to add events to a traumatic event and more likely to omit facts.

The defense argued that the allegations of sexual molestation were false, and that the factual consistency between the victims points to a script. Defense counsel said the prosecutor "acknowledged that there are false molest allegations that do happen. It is a

17.

reality." Confabulation "could be lying or it could be mixing things that are just not true, that have been suggested to you or that you have come to believe for some reason that aren't true." Defense counsel pointed out the discrepancies in the witness testimony and argued that "if a tale is told and it's not true, it will change. There will be details that change." Defense counsel suggested that the witnesses decided they needed to get justice for Jane Doe 6 and "that kind of moral frenzy can make people say something that is not true, lie or misremember, or have a memory suggested to them."

### B. *Standard of Review and Applicable Law*

A defendant claiming ineffective assistance of counsel must satisfy the two-part test of *Strickland*, requiring a showing of counsel's deficient performance and prejudice. (*Strickland v. Washington* (1984) 466 U.S. 668, 687 (*Strickland*).) As to deficient performance, a defendant "must show that counsel's representation fell below an objective standard of reasonableness" measured against "prevailing professional norms." (*Id*. at p. 688.) In evaluating trial counsel's actions, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." (*Id*. at p. 689; see *People v. Dennis* (1998) 17 Cal.4th 468, 541 (*Dennis*).) Thus, a defendant must overcome the presumption that the challenged action might be considered sound trial strategy under the circumstances. (*Strickland*, *supra*, at p. 689; *Dennis*, *supra*, at p. 541.) " ' "[I]f the record on appeal sheds no light on why counsel acted or failed to act in the manner challenged, an appellate claim of [ineffective assistance of counsel] must be rejected unless counsel was asked for an explanation and failed to provide one, or there simply could be no satisfactory explanation." ' " (*People v. Seumanu* (2015) 61 Cal.4th 1293, 1312–1313.) "Reasonableness must be assessed through the likely perspective of counsel at the time." (*People v. Ochoa* (1998) 19 Cal.4th 353, 445.)

The prejudice prong requires a defendant to establish "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (*Strickland*, *supra*, 466 U.S. at p. 694.) "A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Ibid*.)

Expert testimony on "the common reactions of child molestation victims," is known as CSAAS, or child sexual abuse accommodation syndrome. (See *People v. McAlpin* (1991) 53 Cal.3d 1289, 1300 (*McAlpin*); *People v. Munch* (2020) 52 Cal.App.5th 464, 466.) CSAAS has long been held admissible in California for the limited purposes of dispelling commonly held myths or misconceptions about child sexual abuse and aiding the jury in "evaluating the credibility of an alleged child victim of sexual abuse." (*People* v. *Lapenias* (2021) 67 Cal.App.5th 162, 171 (*Lapenias*); see *McAlpin, supra,* at pp. 1300–1301; *People v. Bowker* (1988) 203 Cal.App.3d 385, 393–394 (*Bowker*).) CSAAS testimony is permitted " 'to explain the emotional antecedents of abused children's seemingly self-impeaching behavior,' " such as delayed disclosure of the abuse. (*McAlpin*, *supra,* at pp. 1300–1301; see *Lapenias*, *supra,* at p. 172.)

"However, pursuit of that laudable rehabilitative purpose must not lead the expert to cross over into affirmatively vouching for the truthfulness of a complainant's allegations against the defendant." (*People v. Sedano* (2023) 88 Cal.App.5th 474, 479–480; see *Lapenias*, *supra*, 67 Cal.App.5th at p. 180 [expert must not vouch for the veracity of the alleged victims]; *People v. Munch*, *supra*, 52 Cal.App.5th at p. 468 [" 'The expert is not allowed to give an opinion on whether a witness is telling the truth ....' "].) CSAAS evidence "is not admissible to prove that the complaining witness has in fact been sexually abused." (*McAlpin*, *supra*, 53 Cal.3d at p. 1300.) Accordingly, a CSAAS expert also "may not give ' "general" testimony describing the components of the syndrome in such a way as to allow the jury to apply the syndrome to the facts of the case and conclude the child was sexually abused.' " (*People v. Julian* (2019) 34 Cal.App.5th 878, 885 (*Julian*).) Overall, the testimony must respect the " ' "fine but

19.

essential" ' " line between an " ' "opinion which would be truly helpful to the jury and that which merely conveys a conclusion concerning defendant's legal guilt." ' " (*Id*. at p. 887.)

"Thus, the Courts of Appeal have repeatedly held it to be an abuse of discretion to permit a CSAAS expert to testify—either qualitatively, or with specific statistics or percentages—to the infrequency with which children make false allegations of sexual abuse." (*Sedano, supra*, 88 Cal.App.5th at p. 480; see *Lapenias, supra*, 67 Cal.App.5th at p. 179 [error to admit expert testimony that it was " 'rare' for children to make false allegations of sexual abuse"]; *People v. Wilson* (2019) 33 Cal.App.5th 559, 568, 570–571 (*Wilson*) [expert testimony about studies finding false allegations in 1-to-6 percent of cases had the impermissible "effect of telling the jury there was at least a 94 percent chance that any given child who claimed to have been sexually abused was telling the truth"]; see also *Julian, supra*, 34 Cal.App.5th at pp. 883–884 [false allegation statistics were not admissible because they "invited jurors to presume [the defendant] was guilty based on statistical probabilities, and not decide the evidence properly introduced in the case"].)

*C. Analysis*

Defendant claims he received ineffective assistance of counsel when his attorney asked the expert about the percentage of false allegations since this evidence is generally deemed inadmissible. He argues a failure to object to statistical testimony has been held to constitute reversible ineffective assistance of counsel. The People disagree arguing the evidence benefited the defense and was not prejudicial given the brevity of the evidence, the weight of properly admitted evidence, and the instructions given to the jury.

In *Wilson, supra,* 33 Cal.App.5th 559, the defendant claimed the trial court abused its discretion in allowing testimony from a CSAAS expert on statistical probability of false reports in child sex abuse cases. (*Id*. at p. 568.) The *Wilson* court noted the CSAAS

expert's testimony "had the effect of telling the jury there was at least a 94 percent chance that any given child who claimed to have been sexually abused was telling the truth." (*Id*. at p. 570.) The practical result of this testimony "was to suggest to the jury that there was an overwhelming likelihood their testimony was truthful." (*Ibid*.) The *Wilson* court stated such testimony "invaded the province of the jury, whose responsibility it is to 'draw the ultimate inferences from the evidence.' " (*Ibid*.)

Wilson emphasized that it was the jury who must evaluate the victims' testimony, together with all the other evidence, to decide whether their testimony is true or false, and "should do so without statistical evidence placing a thumb on the scale for guilt." (*Wilson*, *supra*, 33 Cal.App.5th at p. 571; see *People v. Collins* (1968) 68 Cal.2d 319, 331 [evidence of mathematical likelihood of any random couple possessing distinctive features of perpetrators of crime would not bear on defendants' guilt because of statistical likelihood other couples also share those features]; *People v. Sergill* (1982) 138 Cal.App.3d 34, 40, italics omitted [officers' opinions of child's truthfulness "did not have a reasonable tendency to prove or disprove [child's] credibility and were therefore not relevant"].) The court determined the "statistical evidence was not relevant, and its admission was more prejudicial than probative," and concluded admitting the CSAAS's statistical evidence was an abuse of discretion. (*Wilson*, *supra,* at p. 571.)

In *Julian*, the court stated that the expert providing CSAAS testimony may not "present 'predictive conclusions' [citation], such as alleged child abuse victims 'should be believed' or 'abused children give inconsistent accounts and are credible nonetheless.' " (*Julian, supra,* 34 Cal.App.5th at pp. 885–886; *Bowker*, *supra*, 203 Cal.App.3d at pp. 393–394.) The *Julian* court noted, "[s]uch predictive conclusions go beyond the scope of CSAAS evidence and may confuse the jury." (*Julian*, *supra,* at p. 886.) The court expressed its concern that "[w]here expert opinions on the statistical probability of guilt are admitted, the jury may be 'distracted' from its 'requisite function of weighing the evidence on the issue of guilt,' and may rely instead on this 'irrelevant'

21.

evidence." (*Ibid*; *People v. Collins, supra,* 68 Cal.2d at p. 327.) Thus, the *Julian* court concluded the expert's testimony regarding statistical probability evidence was inadmissible. (*Julian, supra,* at p. 887.)

After concluding the statistical evidence was inadmissible, the *Julian* court concluded defendant's counsel was prejudicially ineffective for his failure to object to such evidence at trial. (*Julian*, *supra*, 34 Cal.App.5th at pp. 887–888.) "[T]here [was] no justification for counsel's failure to object to [the expert's] statistical evidence on false allegations. It was inadmissible and it improperly suggested [defendant] was guilty based on statistical probabilities that were irrelevant to this case." (*Id.* at p. 888.) In *Julian*, the statistical evidence was considered highly prejudicial since there were credibility issues with the victim's inconsistent statements and strong defense evidence. (*Ibid*.) The *Julian* court also noted defense counsel questioned the expert on cross-examination, but the expert "used that opportunity to repeatedly reassert his claim that statistics show children do not lie about being abused." (*Id*. at pp. 888–889.) Defense counsel's "questions about multiple studies only opened the door to a mountain of prejudicial statistical data that fortified the prosecutor's claim about statistical certainty that defendants are guilty." (*Id*. at p. 889.) The prosecutor was able to use the expert's statistical evidence in closing argument, asking the jury to rely on the expert's statistical evidence that " 'children rarely falsify allegations of sexual abuse.' " (*Id*. at p. 889.) The *Julian* court concluded defendant did not receive a fair trial since "the jury's duty to decide the facts does not include considering inadmissible statistical information [citation] or using studies of statistical odds to determine guilt." (*Ibid*; see *Strickland*, *supra*, 466 U.S. at pp. 686–687.)

The above cases address claims that the trial court erred in admitting the statistical evidence and defense counsel's failure to object to such evidence. However, the present situation is different because defense counsel is the one who intentionally elicited the statistical evidence of false allegations. In such circumstances, the question becomes

whether defendant can overcome the presumption that the challenged action might be considered sound trial strategy under the circumstances. (See *Strickland*, *supra*, 466 U.S. at p. 689; *Dennis*, *supra*, 17 Cal.4th at p. 541.)

A review of the record shows the false allegation evidence was intentionally elicited as part of defense counsel's strategy and used to support defense counsel's arguments. This line of questioning produced testimony that everyone, including children, are capable of lying and included a discussion of a historical case from the 1990's where groups of people made false allegations. Counsel could reasonably have decided that the evidence was more beneficial to the case than prejudicial since it fit the defense theme that Jane Does 1 through 5 made false allegations against defendant in order to get justice for Jane Doe 6. Therefore, the line of questioning regarding false allegations is connected to a sound trial strategy. It is well settled that trial tactics are within the sound discretion of trial counsel (see *People v. Wright* (1990) 52 Cal.3d 367, 412 [disapproved on other grounds by *People v. Williams* (2010) 49 Cal.4th 405, 459]) and deference must be given to counsel's tactical decisions. (*In re Fields* (1990) 51 Cal.3d 1063, 1069–1070.) Therefore, we cannot say there was no satisfactory explanation for defense counsel's line of questioning. (See *People v. Scott* (1997) 15 Cal.4th 1188, 1212; see *People v. Hernandez* (2004) 33 Cal.4th 1040, 1053.)

Even so, we need not decide whether counsel's performance was deficient since defendant fails to demonstrate "there is a reasonable probability that, but for counsel's [alleged] unprofessional errors, the result of the proceeding would have been different." (*Strickland*, *supra*, 466 U.S. at p. 694.) "[A] court need not determine whether counsel's performance was deficient ... [i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice." (*In re Cox* (2003) 30 Cal.4th 974, 1019–1020.)

"In assessing prejudice under *Strickland*, the question is not whether a court can be certain counsel's performance had no effect on the outcome or whether it is possible a reasonable doubt might have been established if counsel [had] acted differently.

[Citations.] Instead, *Strickland* asks whether it is 'reasonably likely' the result would have been different. [Citation.] This does not require a showing that counsel's actions 'more likely than not altered the outcome,' but the difference between *Strickland's* prejudice standard and a more-probable-than-not standard is slight and matters 'only in the rarest case.' [Citation.] The likelihood of a different result must be substantial, not just conceivable." (*Harrington v. Richter* (2011) 562 U.S. 86, 111–112.)

In *Wilson*, the court concluded the inadmissible evidence of percentages of false allegations was not prejudicial under *Watson*. (*Wilson*, *supra*, 33 Cal.App.5th at pp. 571–572; *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*).) The court determined that the inadmissible evidence was brief, the expert acknowledged that it was difficult to tell if a child was making a false allegation and there was no way to know the actual ratio of true to false allegations. (*Wilson, supra,* at p. 572.) Moreover, the court instructed that the jury was the sole judge of the facts and credibility of witnesses, and the defense offered their own rebuttal expert testimony. (*Ibid.*) Under these circumstances, the court saw "no reasonable probability defendant would have achieved a more favorable result in the absence of the challenged testimony." (*Ibid.*) Here as well, the testimony regarding percentage of false allegations was brief. And even though the prosecutor used the statistical evidence in their PowerPoint presentation during closing argument, the defense purposefully used the false allegation evidence in its closing to argue false allegations do exist. Moreover, the jury was instructed they alone were the judge of the credibility of the witnesses and that Dr. Carmichael's testimony was not evidence the defendant committed any of the charged crimes and could be considered only in deciding whether or not a Jane Doe's conduct was not inconsistent with the conduct of someone who has been molested in evaluating the believability of her testimony. We presume the jurors followed these instructions. (*Lapenias*, *supra*, 67 Cal.App.5th at p. 180.)

In *Lapenias*, the court concluded "Dr. Carmichael's testimony that it is 'rare' for children to make false allegations of sexual abuse was inadmissible" and the trial court

erred in allowing the evidence over defendant's objections. (*Lapenias*, *supra*, 67 Cal.App.5th at p. 179.) However, the court did not find the evidence prejudiced defendant because the testimony was brief, as were the mentions of that testimony by both counsel during closing arguments. (*Id*. at p. 180.) Further, contemporaneous disclosures to another person about being molested by defendant provided corroborative evidence of defendant's guilt. (*Ibid*.) The jurors also received the standard evidentiary instructions that they were not bound by an expert's opinion, and that they were the sole judge of the credibility of the witnesses. (*Ibid.* [courts presume jurors follow these instructions].) Applying the *Watson* standard, the court concluded "it is not reasonably probable [defendant] would have received a more favorable result in the absence of Dr. Carmichael's erroneously admitted testimony about the rarity of false allegations of child sexual abuse." (*Lapenias*, *supra,* at p. 180.) Here as well, the testimony regarding false allegations was brief and was touched on by both counsel in closing arguments. Moreover, the jury was instructed that they were not bound by the expert opinion and were the judge of the credibility of witnesses. And last, as in *Lapenias*, Jane Doe 3 and Jane Doe 4 made contemporaneous admissions or complaints to law enforcement that defendant molested them, which provided corroborating evidence of defendant's guilt.

On the other hand, in *Julian*, the court found the expert's statistical evidence on false allegations highly prejudicial "because this case was a credibility dispute between child 2's testimony and [defendant's]." (*Julian*, *supra*, 34 Cal.App.5th at p. 888.) *Julian* was a "heavily contested case with strong defense evidence." (*Ibid*.) In *Julian*, child 1, child 3 and child 4 testified defendant never touched them inappropriately and they never saw defendant touch child 2 inappropriately, child 4 believed child 2 was lying, and the People conceded that child 2's earlier interviews were " 'very different from her testimony' " with " 'serious inconsistencies.' " (*Ibid.,* italics omitted.) Here, however, the prosecution presented a strong case with multiple victims testifying defendant

sexually molested them as children, with relative consistency. Two of the victims reported the assaults to law enforcement around the time of the incidents.

Moreover, the *Julian* court noted that statistical evidence of false allegations "may not be prejudicial where it occurs in a slight passing reference by the expert" but that in *Julian*, "the jury was bombarded with it." (*Julian*, *supra*, 34 Cal.App.5th at p. 888.) In *Julian*, the CSAAS expert continuously used opportunities to repeatedly reassert his claim that statistics show children do not lie about being abused and shared a "mountain of prejudicial statistical data that fortified the prosecutor's claim about a statistical certainty that defendants are guilty." (*Id*. at pp. 888–889.) During closing argument, there was a dispute regarding a specific study on false allegations and the court instructed the jury to "decide the issue based on the evidence introduced about the study," directing the juror's attention to the statistical studies. (*Id*. at p. 889.) To the contrary here, statistical evidence on false allegations was not brought up in the prosecutor's direct examination and the record does not show the jury was "bombarded" with this evidence. Additionally, the trial court did not direct the jury's attention to the expert's testimony during closing arguments.

After such consideration, we do not find the evidence regarding false allegations to be so prejudicial that it is reasonably probable the jury would have reached a different verdict without the statistical evidence on false allegations. (See *Strickland*, *supra*, 466 U.S. at pp. 691–694.) All five Jane Does testified that defendant touched them on the vagina or buttocks while they slept or appeared to be asleep. Defendant's daughter recorded a phone call with defendant where the jury heard defendant confess to touching Jane Doe 6 on the vagina. Two of the Jane Does contemporaneously reported the incidents in 2004 and 2005, long before the allegations regarding Jane Doe 6 occurred, deflating defendant's theory that the Jane Does got together to make up the allegations to seek justice for Jane Doe 6. Thus, when considering the weight of properly admitted evidence, the brevity of the false allegation evidence solicited by defendant's counsel,

26.

and the instructions given to the jury limiting use of the testimony, there is nothing in the record showing there is a reasonable probability that, but for defense counsel's decision to bring in statistical evidence on false allegations, the result of the proceeding would have been different.  (See *Strickland*, *supra*, 466 U.S. at p. 694.)

We reject defendant's argument that prejudice can be shown because the jury was unable to reach a consensus on two of the five charged counts.  The defendant's reliance on *People v. Sojka* (2011) 196 Cal.App.4th 733, 739 and *People v. Torres* (2011) 198 Cal.App.4th 1131 is misplaced since both cases involve jury instruction error.  Instead, the fact that the jury did not reach a verdict on two of the five counts shows the statistical evidence on false allegations did not prejudice the jury against defendant. Accordingly, we reject defendant's first claim.

II.    *MARSDEN* MOTION.

Defendant next claims the trial court erred when it denied his *Marsden*[8] motion. The People disagree arguing the trial court properly dismissed the motion on the basis that it would have disrupted the trial and that defendant made no showing of ineffective assistance of counsel.  We conclude the trial court did not err in denying the *Marsden* motion.

*A.  Relevant Factual History*

After Jane Doe 1, Jane Doe 2, Jane Doe 3 and Jane Doe 4 testified for the prosecution, defendant made a *Marsden* motion,[9] asking for his counsel and his office to be relieved and to appoint new counsel.  The prosecution was excluded from the courtroom and a separate *Marsden* hearing was held.  The trial court informed defendant "there's going to be an issue with timeliness, but I will hear from you regarding what is

---

[8]    *Marsden, supra,* 2 Cal.3d 118.

[9]    Although defendant made two different *Marsden* motions, he only challenges the May 13, 2021 motion.

27.

the issue with [defense counsel]." Defendant stated his trial counsel was "not the right fit" and complained that his attorney did not bring up specific evidence during cross-examination of the victims "where they didn't see my face or I didn't touch them. He didn't bring it up. I had to bring it up. That's why he's not the right fit. He works for you guys, not for me. You guys paid him." Defendant claimed that the defense counsel worked for the district attorney. Defendant argued that "every time a person brings up what '[defendant did] to his granddaughter' ... [his counsel] is already incriminating me to this jury. He has already corrupted that jury." Defendant stated he is "objecting to what he is saying every time a person goes up there."

The court explained to defendant that it ruled adversely to defendant on Evidence Code section 1101 and section 1108 types of evidence so his defense counsel "is somewhat handcuffed by the Court's rulings on the law on the case." The "District Attorney's Office gets to bring in some of these other allegations against you based on the law that is presented." The defendant expressed his frustration that his counsel failed to use evidence that a witness said she did not see a person. When the court reminded defendant that his attorney did ask about this evidence he agreed but argued that he "made him."

Defense counsel explained that he had been practicing law for 30 years and was assigned to this case for over one year. Counsel explained the theory of the case was that the Jane Does believed defendant molested his granddaughter Jane Doe 6 and wanted to believe they were molested by him. Defendant is upset that he mentioned Jane Doe 6 but counsel explained that he was using his best instincts to create a reasonable doubt. There is a tape-recorded confession and so they have to deal with what defendant said about molesting Jane Doe 6. Counsel explained that defendant was not charged with molesting Jane Doe 6 and so all he needed to do was create reasonable doubt about the witnesses.

The court explained to defendant that the court ruled to admit the tape recording of his conversation regarding Jane Doe 6 and his attorney had to deal with this evidence.

28.

The court denied the *Marsden* motion for the following reasons: (1) the motion was untimely as they were already in a jury trial and "that motion is a motion usually saved for prior to jury"; and (2) defense counsel was "dealing with some adverse rulings by the Court related to the admissibility of Jane Doe [4], [5] and the pretext phone call related to Jane Doe [6]." And although defense counsel's strategy is different from defendant's strategy, counsel is utilizing his skills as an attorney and provided his reasons for his strategy. Therefore, the court denied the motion and did not find counsel ineffective.

### B. Standard of Review and Applicable Law

Under *Marsden*, a criminal defendant can move to discharge his current appointed counsel and appoint new counsel based on ineffective assistance. (*Marsden, supra,* 2 Cal.3d at p. 123; see *People v. Sanchez* (2011) 53 Cal.4th 80, 86 [*Marsden* motion used to seek appointment of substitute counsel].) The California Supreme Court held that a defendant may be entitled to new appointed counsel where the attorney-client relationship has broken down to the point where the defendant's right to the assistance of counsel is impaired. The *Marsden* court also held that in making this determination, the trial court must allow the defendant to explain the manner in which he believes his counsel is performing inadequately. (*Marsden, supra,* at pp. 123–124.)

" '[S]ubstitute counsel should be appointed when ... necessary under the *Marsden* standard, that is whenever, in the exercise of its discretion, the court finds that the defendant has shown that a failure to replace the appointed attorney would substantially impair the right to assistance of counsel [citation], or, stated slightly differently, if the record shows that the first appointed attorney is not providing adequate representation or that the defendant and the attorney have become embroiled in such an irreconcilable conflict that ineffective representation is likely to result [citation]." (*People v. Sanchez, supra,* 53 Cal.4th at p. 86; *People v. Smith* (1993) 6 Cal.4th 684, 692 [same]; *People v. Hines* (1997) 15 Cal.4th 997, 1025–1026.) A trial court should appoint substitute counsel

when a proper showing has been made at any stage. (*Smith, supra,* at p. 695.) However, " '[i]t is within the trial court's discretion to deny a motion to substitute made on the eve of trial where substitution would require a continuance.' [Citation.] This is even more true if the motion is made *during* trial." (*People v. Smith* (2003) 30 Cal.4th 581, 607.) A court may not automatically deny a motion for new counsel during trial no matter what the showing, but it should grant such a motion only when the defendant demonstrates that counsel is truly providing inadequate representation or that a total breakdown in the relationship has occurred that the defendant did not cause. (*Ibid.*)

Our Supreme Court approved the following three factors to consider on review: " ' "(1) timeliness of the motion; (2) adequacy of the court's inquiry into the defendant's complaint; and (3) whether the conflict between the defendant and his attorney was so great that it resulted in a total lack of communication preventing an adequate defense." ' " (*People v. Smith, supra,* 30 Cal.4th at p. 606.) Whether to grant a *Marsden* motion lies within the trial court's discretion, which will not be overturned on appeal absent a clear abuse of that discretion. (*People v. Smith, supra,* 6 Cal.4th at p. 696.)

*C. Analysis*

Defendant challenges the trial court's denial of his *Marsden* motion arguing it was not well-founded to deem it untimely and that the record demonstrates his right to assistance of counsel was impaired. The People contend it was appropriate for the court to consider that the *Marsden* motion was raised in the middle of trial and that the court properly found that his defense counsel was providing effective assistance and that appointing new counsel was not warranted.

" '[A] criminal defendant, at any stage of the trial, must be given the opportunity to state reasons for a request for new counsel.' " (*People v. Lopez* (2008) 168 Cal.App.4th 801, 814.) In *Lopez*, the defendant made a motion for substitute counsel due to the conflict that was raised in open court. (*Ibid.*) The trial court denied the

30.

defendant's *Marsden* motion as untimely without holding a hearing.  (*Lopez, supra,* at p. 813.)  The appellate court reversed, concluding the denial of the *Marsden* motion as "not timely" without a record to clarify the court's reasoning was in error.  (*Lopez, supra,* at p. 815.)  Here, although the trial court called the motion "untimely," it did not deny defendant the opportunity to state his reasons for requesting new counsel.  Nor did the court deny the motion based on untimeliness as the sole basis.

Applying the *Marsden* test, defendant fails to demonstrate that his counsel truly provided inadequate representation or that there was a total breakdown in the relationship that defendant did not cause.  (See *People v. Smith, supra,* 30 Cal.4th at p. 607; see also *People v. Hines, supra,* 15 Cal.4th at p. 1025 [defendant must make a " 'substantial showing that failure to order substitution is likely to result in constitutionally inadequate representation' "].)  Defendant was concerned that his counsel was "incriminating" him every time he asked a witness about Jane Doe 6 and the allegation that defendant molested Jane Doe 6.  (See *People v. Smith*, *supra*, 6 Cal.4th at p. 696.)  However, defense counsel explained how his questions regarding Jane Doe 6 were part of his defense strategy. " 'A defendant does not have the right to present a defense of his own choosing, but merely the right to an adequate and competent defense.  [Citation.] Tactical disagreements between the defendant and his attorney do not by themselves constitute an "irreconcilable conflict." ' " (*People v. Jackson* (2009) 45 Cal.4th 662, 688.) When the court reminded defendant that his tape-recorded confession was coming in and he was going to have to deal with it, defendant understood that they were going to have to deal with that evidence.  Since defendant was not charged with molesting Jane Doe 6 defense counsel was using "an adequate and competent defense" to create a reasonable doubt in the testifying witnesses.  Therefore, the trial court did not abuse its discretion when it concluded new counsel was not warranted.

Defendant raises additional arguments that were not raised at the *Marsden* hearing. Defendant contends his counsel rendered a "tepid, inept argument" regarding the

Evidence Code section 1108 witnesses during the pretrial in limine hearing, and that "it might [have been] appropriate to only have one witness." However, the record shows defense counsel objected to the evidence as prejudicial, cumulative and unfair, and did in fact suggest to the court that it could limit the character witnesses to just one. Defendant also complains that his attorney made no objection when Jane Doe 1 testified regarding an unchargeable incident that occurred in Mexico. However, the failure to object is a matter which usually involves tactical decisions on counsel's part and seldom establishes counsel's incompetence. (*People v. Jackson* (1980) 28 Cal.3d 264, 292, disapproved of on other grounds in *People v. Cromer* (2001) 24 Cal.4th 889, 901, fn. 3.)

.) The record does not show counsel's reason for not objecting and defendant fails to demonstrate counsel had no tactical reason for not objecting to this testimony. (See *Strickland, supra,* 466 U.S. at p. 689 [defendant must overcome strong presumption counsel's actions were sound strategy].)

Last, defendant's complaint regarding defense counsel's direct examination of the defense witness cannot be considered on review of the *Marsden* hearing since it occurred after the *Marsden* hearing. A trial court's decision is reviewed to determine whether it was correct when made, and not in light of subsequent events. (*People v. Williams* (2006) 40 Cal.4th 287, 311.) Consequently, defendant's claim fails.

III.   DR. CARMICHAEL DID NOT EXCEED THE SCOPE OF HIS EXPERTISE AT TRIAL AND DEFENSE COUNSEL WAS NOT INEFFECTIVE FOR FAILING TO OBJECT TO SUCH TESTIMONY.

Defendant next contends Dr. Carmichael exceeded the scope of his expertise by testifying about memory in the context of child sexual abuse and that his counsel was prejudicially ineffective for failing to object to this testimony. The People first point out that defendant forfeited this claim by failing to object to this specific testimony. Even considering the claim, the People contend Dr. Carmichael testified well within his area of

32.

expertise and that defendant fails to demonstrate prejudice under either standard. We agree with the People and reject defendant's claim.

*A. Relevant Factual History*

Before trial, the People filed a motion in limine to admit the expert testimony of Dr. Anthony Urquiza, Ph.D., regarding "a variety of topics concerning victims of child molestation, generally. Dr. Urquiza will testify and help dispel the common myths and misconceptions surrounding child sexual abuse." One such myth is that "[c]hild molestation victims are always great historians. After all, something horrific happened to them. They should remember the details like the back of their own hand." At a hearing on the motions in limine, defense counsel withdrew his objections to the expert testimony, but stated, "depending upon how the evidence comes out, there could be an objection at a certain point."

During the trial, the prosecution called Dr. Blake Carmichael, rather than Dr. Urquiza, as an expert in the behavior of child sexual abuse victims. Dr. Carmichael testified he was a clinical psychologist who primarily worked with children and families who have a history of child maltreatment, which includes sexual abuse. Dr. Carmichael worked at the Child Adolescent Abuse Resource Evaluation Diagnostic and Treatment Center (CAARE) under the University of California at Davis for 20 years. Dr. Carmichael began as a post-doctorate fellow and then served as a therapist or a primary staff psychologist. After about 12 years, Dr. Carmichael became the evaluation program manager and was responsible for assessments, training and supervising cases. In that time, Dr. Carmichael worked with around 350 children who had been sexually abused. Dr. Carmichael also teaches and gives presentations regarding "child sexual abuse, the impact of trauma on kids, effective treatment, and support for those families' assessment." He keeps up with the most recent research and was nationally certified in trauma-focused cognitive behavior therapy. Dr. Carmichael has testified as an expert in

33.

the field of the behavior of child sexual abuse victims over 100 times.  The court designated Dr. Carmichael as an expert and the defense did not object.

Dr. Carmichael explained why child sexual abuse victims may not be great historians in all instances.  There are a number of reasons why kids who have been sexually abused may not be good at telling things consistently each time they talk about it.  One reason is disassociation, which he described as when "abuse is happening and you are trying to ignore it, avoid it, not think about it, pull yourself back from what actually is happening ... or you are pulling away from or pushing away the experience itself."  Kids might feel anxious or fearful talking about certain details and so even if a child remembers something, it does not mean they are comfortable talking about it.

To help the jury understand, Dr. Carmichael explained how memory works and that time sequence and order are vague and abstract concepts for a child.  Memory is not a video camera.  In the cases where children are reporting incidents as adults, the memory is still implanted as a child.  The person might use adult language, but at the time of the incident, it may not be the way it was experienced.  Dr. Carmichael also explained that if something happens multiple times over the course of many months and even years, it is a lot harder to get each discreet, individual event recalled and discussed, especially if a long time has passed.  If something happens once, there is a good chance that a person can think about the event and recall all of it.  However, if someone is numbing out, even a discreet event may be difficult to recall.

Dr. Carmichael was familiar with the primacy and recency effect.  He described primacy as the first time something happens, which can be easier to remember.  When there are "subsequent events that are similar, you might remember that first time a little better, especially if it made a big impact on you or you really enjoyed it."  Recency is remembering the last time something happened, because less time has passed for you to start forgetting things.  Dr. Carmichael explained that his testimony on memory applies to the area of sexual abuse because these are the "reasons why kids will remember or not

remember certain things, it's not just because of the first time or the most recent time. Certainly it can apply, but because of the emotional implications, the cognitive implications, the social implications, the family implications, it may not be the first or last time this is most memorable to some kids."

During closing argument, the prosecutor referenced Dr. Carmichael's testimony on the "primacy/recency effect" in relation to Jane Doe 1's testimony, in showing that she clearly remembered the first incident where defendant massaged her back and the third incident in Mexico, but the "middle time was a little jumbled." The prosecutor also referred to testimony by Dr. Carmichael that "victims of child sexual abuse aren't typical great historians" because they "zone out" and "don't want to focus on the physical abuse that is happening to them..."

The prosecutor also referred to Dr. Carmichael's testimony that "in traumatic situations, [it is] much more common for people to [omit] facts than add facts to a story, which is exactly what Jane Does did, which is omit facts, if anything." The prosecutor stated that, based on Dr. Carmichael's testimony, it is not true to think that "[i]f that happened to me, I would remember every detail of what happened to me." The prosecutor reminded the jury about the myth that children are great historians of their abuse and that kids are not good at discussing their abuse consistently since they disassociate in an attempt to ignore what is happening to them. The prosecutor reiterated the expert's testimony that time, sequence and order are difficult for children to understand. And again explained with regard to Jane Doe 1 that "it can be more difficult to remember the abuse if it happened more than once or in a small window of time verses if it happened over a longer window of time." The prosecutor also touched on Dr. Carmichael's testimony that it was difficult to implant a false memory of a negative or implausible event and that childhood molestation would fall within this category.

Defense counsel argued that the Jane Does decided to get justice for Jane Doe 6 and "that kind of moral frenzy can make people say something that is not true, lie or

35.

misremember, or have a memory suggested to them." Defense counsel also referenced Dr. Carmichael in arguing a five-year-old is inherently suggestible and the memories are inherently not dependable. The prosecutor argued on rebuttal though, that there was "no evidence about a five year old being inherently unreliable. Dr. Carmichael talked about the fact that they are perhaps suggestible at that age, but that does not make them inherently unreliable."

*B. Standard of Review and Applicable Law*

Evidence Code section 720 provides that: "(a) A person is qualified to testify as an expert if he has special knowledge, skill, experience, training, or education sufficient to qualify him as an expert on the subject to which his testimony relates. Against the objection of a party, such special knowledge, skill, experience, training, or education must be shown before the witness may testify as an expert. [¶] (b) A witness' special knowledge, skill, experience, training, or education may be shown by any otherwise admissible evidence, including his own testimony."

"If a witness is testifying as an expert, his testimony in the form of an opinion is limited to such an opinion as is: [¶] (a) Related to a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact; and [¶] (b) Based on matter (including his special knowledge, skill, experience, training, and education) perceived by or personally known to the witness or made known to him at or before the hearing, whether or not admissible, that is of a type that reasonably may be relied upon by an expert in forming an opinion upon the subject to which his testimony relates, unless an expert is precluded by law from using such matter as a basis for his opinion." (Evid. Code, § 801.)

"Whether a person qualifies as an expert in a particular case, however, depends upon the facts of the case and the witness's qualifications. [Citation.] The trial court is given considerable latitude in determining the qualifications of an expert and its ruling

36.

will not be disturbed on appeal unless a manifest abuse of discretion [is] shown." (*People v. Bloyd* (1987) 43 Cal.3d 333, 357; *People v. Singh* (1995) 37 Cal.App.4th 1343, 1377; *People v. Bolin* (1998) 18 Cal.4th 297, 321-322 [whether a witness qualifies as an expert is reviewed for abuse of discretion].)  This court may find error only if the witness "*clearly lacks* qualification as an expert."  (*People v. Hogan* (1982) 31 Cal.3d 815, 852, italics in original, disapproved on other grounds in *People v. Cooper* (1991) 53 Cal.3d 771, 836; *Singh*, *supra*, at p. 1377.)  " ' "Where a witness has disclosed sufficient knowledge of the subject to entitle his opinion to go to the jury, the question of the degree of his knowledge goes more to the weight of the evidence than its admissibility." ' " (*Bolin, supra,* at p. 322.)

To prove ineffective assistance of counsel, defendant bears the burden of showing by a preponderance of the evidence that (1) counsel's performance was deficient because it fell below an objective standard of reasonableness under prevailing professional norms, and (2) counsel's deficiencies resulted in prejudice.  (*Strickland*, *supra*, 466 U.S. at pp. 688, 694; *People v. Ledesma* (2006) 39 Cal.4th 641, 746.)

*C.  Analysis*

Defendant claims that Dr. Carmichael's testimony went beyond the parameters of his expertise when he gave his opinions on memory.  Defendant argues there was no evidence Dr. Carmichael was qualified to address how memory works and that this evidence exceeded the scope of CSAAS evidence.  Defendant claims the introduction of this evidence under the circumstances of this case abridged his rights to due process of law and that his counsel's failure to object to this testimony constitutes ineffective assistance of counsel.  Defendant further contends the error requires reversal under either the *Chapman* or *Watson* standards of review.  The People first point out that defendant forfeited this claim by failing to object to this specific testimony at trial.  They also

contend Dr. Carmichael was well within his area of expertise and that defendant fails to show his counsel's performance was deficient or prejudicial.

Defendant concedes that he failed to raise a specific objection to the expert's testimony on memory. Defendant also failed to object to Dr. Carmichael's qualification to give such testimony. Consequently, defendant forfeits for appellate review both the claim that Dr. Carmichael was not qualified to give testimony on memory and that the testimony on memory exceeded the scope of permissible CSAAS testimony.[10] (See *People v. Morales* (2020) 10 Cal.5th 76, 98 [defendant forfeited claim of error by not objecting to the expert testimony]; *People v. Doolin* (2009) 45 Cal.4th 390, 434 [failure to object results in forfeiture]; *People v. Williams* (2008) 43 Cal.4th 584, 620 [admissibility of evidence will not be reviewed on appeal in the absence of a specific and timely objection in the trial court].)

Alternatively, defendant fails to demonstrate his counsel was ineffective for failing to object. (See *Strickland*, *supra*, 466 U.S. at pp. 688, 694.) First, defendant fails to demonstrate Dr. Carmichael was not qualified as an expert to testify on memory as it relates to child sexual abuse victims. After describing that he had over 20 years of experience in working with children who were sexually abused and training others, Dr. Carmichael was designated by the court as an expert in the behavior of child sexual abuse victims. Based on the record, it cannot be said the trial court abused its discretion in designating Dr. Carmichael an expert on the behavior of child sexual abuse victims. (See *People v. Bolin*, *supra*, 18 Cal.4th at pp. 321–322.)

Second, defendant fails to demonstrate Dr. Carmichael testified to matters beyond his area of expertise. " ' "Where a witness has disclosed sufficient knowledge of the subject to entitle his opinion to go to the jury, the question of the degree of his knowledge

---

**10** To the extent defendant suggests his forfeiture should be excused, he fails to offer any basis to overcome the requirements of Evidence Code section 353, subdivision (a).

goes more to the weight of the evidence than to its admissibility." ' " (*People v. Nelson* (2016) 1 Cal.5th 513, 536; *People v. Bolin, supra,* 18 Cal.4th at pp. 321–322.)  As a designated expert on behaviors of children of sexual abuse, Dr. Carmichael's testimony was "needed to disabuse jurors of commonly held misconceptions about child sexual abuse, and to explain the emotional antecedents of abused children's seemingly self-impeaching behavior." (*McAlpin, supra,* 53 Cal.3d at p. 1301; Myers et al., *Expert Testimony in Child Sexual Abuse Litigation* (1989) 68 Neb.L.Rev. 1, 89, fn. omitted; *Lapenias, supra,* 67 Cal.App.5th at p. 171.)  Such expertise involves the myths or misconceptions of child sexual abuse behavior, which includes dispelling the myth that child sexual abuse victims are great historians.  Dr. Carmichael explained that evidence about memory directly applies to the area of child sexual abuse because it relates to the "reasons why kids will remember or not remember certain things," including whether the incident was the first time or the most recent time.  Thus, Dr. Carmichael's testimony was properly "targeted to a specific 'myth' or 'misconception' suggested by the evidence." (*Bowker, supra,* 203 Cal.App.3d at pp. 393–394.)

We are not persuaded by the cases defendant relies upon in arguing Dr. Carmichael's testimony on memory fell outside his expertise.  In *People v. Hogan, supra,* 31 Cal.3d 815, the expert could not recall any specific training on blood spatters and the court found his mere observation of bloodstains did "not invest the criminalist with expertise to determine whether the stains were deposited by 'spatters' or 'wipes.' " (*Id*. at p. 853.)  Here, there is nothing in the record demonstrating Dr. Carmichael did not have the requisite training on the myths and misconceptions of sexually abused children, which includes memory when discussing the myth that children are great historians of the incidents.  Defendant also relies on *People v. Kelly* (1976) 17 Cal.3d 24, abrogated by statute on another point as explained in *People v. Wilkinson* (2004) 33 Cal.4th 821, 845–848, where the witness had experience as a technician and law enforcement officer, but not as a scientist.  The court found the technician's training and experience did not

39.

necessarily qualify him to express an informed opinion of the view of the scientific community toward voiceprint analysis. (*Id*. at p. 39.) The *Frye*[11] test could only be satisfied by a showing of general acceptance by those scientists who are most familiar with the use of a new technique. (*Kelly, supra,* at p. 40.) Here, however, Dr. Carmichael had the requisite qualifications to be an expert on behaviors of child sexual abuse. Furthermore, our Supreme Court has held that the *Kelly*/*Frye* test does not apply to expert testimony on child sexual abuse behavior. (*People v. Stoll* (1989) 49 Cal.3d 1136, 1161; *People v. Munch, supra,* 52 Cal.App.5th at p. 473; *People v. Harlan* (1990) 222 Cal.App.3d 439, 449.)

We reject the claim there must be direct testimony from Dr. Carmichael that he had specific training on memory. In *Nelson* the court held that the expert's "training in the examination of crime scenes, crime scene reconstruction, bullet trajectories, and bloodstain pattern analysis was sufficient to permit her to render an opinion on shot sequence. It was not necessary for the scope of [her] employment to be specifically focused on that subject matter." (*People v. Nelson, supra,* 1 Cal.5th at p. 537.) Here, Dr. Carmichael had a Ph.D. in clinical psychology, with over 20 years' experience in treating and supervising the treatment of children who had suffered sexual abuse. This was sufficient to permit him to testify on the myths of child sexual abuse behaviors that included how memory affects their recollection about the events. Consequently, defendant fails to demonstrate his attorney was ineffective for failing to object to such evidence. (See *People v. Anderson* (2001) 25 Cal.4th 543, 587 [no duty to make a futile request]; *People v. Riel* (2000) 22 Cal.4th 1153, 1202 [no duty to object simply to generate appellate issues].)

---

**11**     *Frye v. United States* (D.C. Cir. 1923) 293 F. 1013, superseded by the adoption of the Federal Rules of Evidence as stated in *Daubert v. Merrell Dow Pharmaceuticals, Inc.* (1993) 509 U.S. 579, 587.

Regardless, defendant fails to demonstrate any alleged error was prejudicial. The jury was instructed that Dr. Carmichael's "testimony about child sexual abuse victims is not evidence that the defendant committed any of the crimes charged against him. You may consider this evidence only in deciding whether or not a Jane Doe's conduct was not inconsistent with the conduct of someone who has been molested, and in evaluating the believability of her testimony." The jury was also instructed that it was free to decide the correctness of an expert's opinion and its importance. Here, the jury heard about Dr. Carmichael's experience and training and so the question of the degree of his knowledge in the area of memory " ' "goes more to the weight of the evidence than its admissibility." ' " (*People v. Bolin, supra,* 18 Cal.4th at p. 322; *People v. Nelson, supra,* 1 Cal.5th at p. 536 [same].) Moreover, as discussed *ante*, multiple victims with relatively consistent stories and contemporaneous reporting of the incidents to law enforcement provided strong evidence supporting defendant's convictions. As such, we cannot conclude that it is reasonably probable that, but for defense counsel's failure to object to the memory evidence, a verdict more favorable to defendant would have been reached. (See *Strickland*, *supra*, 466 U.S. at p. 694.) Therefore, we reject defendant's claim.

IV. THE TRIAL COURT DID NOT ABUSE ITS DISCRETION IN ADMITTING EVIDENCE OF DEFENDANT'S PRIOR ACTS.

Defendant next claims the trial court abused its discretion in admitting evidence of five uncharged acts from four different witnesses. The People disagree and state the uncharged acts were not particularly prejudicial compared with the charged acts and their similarity to the charged acts increased their probative value. We conclude the trial court did not abuse its discretion in admitting evidence of the uncharged acts.

*A. Relevant Facts*

The prosecution filed a motion in limine to admit uncharged acts as evidence under Evidence Code section 1101, subdivision (b) and section 1108. The motion moved to "permit evidence of the Defendant's uncharged sex offenses involving Jane Doe 4,

41.

Jane Doe 5, and Jane Doe 6 since the Defendant has demonstrated a character trait of deviant sexual behavior."

In the pretrial hearing, the prosecution relayed to the court that it planned to call Jane Does 4 and 5, plus K.M. for the pretext call. Defendant objected to the prosecution calling the witnesses as cumulative and unfair and prejudicial under Evidence Code section 352. The trial court ruled that it would "allow the [Evidence Code section] 1108 evidence against [defendant] based on the facts that have been presented in the motion and the facts known to the Court."

On the issue of limiting the number of witnesses, the People stated they only had two Evidence Code section 1108 witnesses testifying, and they would not pose an undue consumption of time. The prosecutor anticipated an hour or two at most for both. Plus, the prosecution added they would call K.M., who would be laying the foundation for the pretext call and her testimony was estimated to be very short. The court ruled Jane Does 4 and 5 could testify and stated it did not feel their testimony was "cumulative as it relates to the nature of these particular charges, multiple allegations of child molestation over a period of time with multiple victims and two short witnesses, as well as the daughter." Additionally, in reference to Jane Doe 6, the court stated it did "not feel it would be overly or substantially-more prejudicial than probative. I find [it is] very probative in this particular case." The trial court also noted that its ruling was without prejudice for the defendant to interject an objection at trial if the evidence does get too long or becomes too cumulative.

At the close of evidence, the court instructed the jury as follows:

"The People presented evidence that the defendant committed the crime of lewd acts upon a child under the age of 14, [section] 288[, subdivision] (a); to wit, Jane Doe [1] and that's related to the Mexico event; Jane Doe [5] and [6]; and then the crime of lewd and lascivious acts on a 14-, 15-year-old child, … [s]ection 288[, subdivision] (c)(1) with Jane Doe [4] that were not charged in this case. These crimes are defined for you in these instructions."

42.

"You may consider this evidence only if the People have proved by a preponderance of the evidence that the defendant, in fact, committed the uncharged crimes.

"Proof by a preponderance of the evidence is a different burden of proof from proof beyond a reasonable doubt. A fact is proved by a preponderance of the evidence if you conclude that it's more likely than not that the fact is true. If the People have not met this burden of proof, you must disregard this evidence entirely.

"If you decide that the defendant committed the uncharged offenses, you may but are not required to conclude from that evidence that the defendant was disposed or inclined to commit sexual offenses, and based on that decision also conclude that the defendant was likely to commit lewd acts upon a child, as charged here.

"If you conclude that the defendant committed the uncharged offenses, that conclusion is only one factor to consider along with all the other evidence. It is not sufficient by itself to prove that the defendant is guilty of a lewd act upon a child. The People must still prove that charge or the charge beyond a reasonable doubt. Do not consider this evidence for any other purpose."

At closing argument, the prosecutor discussed the court's instructions and evidence of the uncharged acts. The prosecutor argued that, as to the uncharged acts, "the law literally allows you to consider this other evidence in conjunction with the evidence presented as to Counts 1 through 5, Jane Does [1] through [3], and consider that he was disposed or inclined to commit sexual offenses as a result." The prosecutor also stated as to the charged counts that "if you find him guilty of one count, you can use that to consider whether he was disposed or inclined to commit the other counts."

*B. Standard of Review and Applicable Law*

Evidence Code section 1108, subdivision (a), provides, "In a criminal action in which the defendant is accused of a sexual offense, evidence of the defendant's commission of another sexual offense or offenses is not made inadmissible by Section 1101, if the evidence is not inadmissible pursuant to Section 352." "Subject to Evidence Code section 352, Evidence Code section 1108 permits a jury to consider prior incidents of sexual misconduct for the purpose of showing a defendant's propensity to commit

43.

offenses of the same type, and essentially allowing such evidence to be used in determining whether the defendant is guilty of the current sexual offense charge." (*People v. Miramontes* (2010) 189 Cal.App.4th 1085, 1096.)

Evidence Code section 1108 was intended "to assure that the trier of fact would be made aware of the defendant's other sex offenses in evaluating the victim's and defendant's credibility," and reflects the determination that "the policy considerations favoring the exclusion of evidence of uncharged sexual offenses are outweighed in criminal sexual offense cases by the policy considerations favoring the admission of such evidence." (*People v. Falsetta* (1999) 21 Cal.4th 903, 911 (*Falsetta*).) There is, therefore, "a strong presumption in favor of admitting sexual assault evidence under Evidence Code section 1108 to show propensity to commit charged crimes." (*People v. Merriman* (2014) 60 Cal.4th 1, 62.)

Evidence Code section 1108 preserves the trial court's discretion to exclude evidence under Evidence Code section 352 if its prejudicial effect substantially outweighs its probative value. (*Falsetta, supra,* 21 Cal.4th at p. 916; *People v. Pierce* (2002) 104 Cal.App.4th 893, 900.) Uncharged sexual offense conduct is admissible under Evidence Code section 352 if its probative value is not " 'substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury.' " (*Falsetta, supra,* at p. 916, italics omitted.) In evaluating propensity evidence under Evidence Code section 352, trial judges "must consider such factors as its nature, relevance, and possible remoteness, the degree of certainty of its commission and the likelihood of confusing, misleading, or distracting the jurors from their main inquiry, its similarity to the charged offense, its likely prejudicial impact on the jurors, the burden on the defendant in defending against the uncharged offense, and the availability of less prejudicial alternatives ...." (*Falsetta, supra,* at p. 917.)

44.

The factors to be considered in the Evidence Code section 1108 analysis under Evidence Code section 352 include: "(1) whether the propensity evidence has probative value, e.g., whether the uncharged conduct is similar enough to the charged behavior to tend to show the defendant did in fact commit the charged offense; (2) whether the propensity evidence is stronger and more inflammatory than evidence of the defendant's charged acts; (3) whether the uncharged conduct is remote or stale; (4) whether the propensity evidence is likely to confuse or distract the jurors from their main inquiry, e.g., whether the jury might be tempted to punish the defendant for his uncharged, unpunished conduct; and (5) whether admission of the propensity evidence will require an undue consumption of time." (*People v. Nguyen* (2010) 184 Cal.App.4th 1096, 1117 (*Nguyen*); *People v. Harris* (1998) 60 Cal.App.4th 727, 738–740 (*Harris*); see also *Falsetta*, *supra*, 21 Cal.4th at p. 917; *People v. Kipp* (1998) 18 Cal.4th 349, 371.)

Appellate courts will not find that a trial court abused its discretion in admitting other sexual acts evidence unless its ruling "falls outside the bounds of reason." (*People v. Kipp*, *supra,* 18 Cal.4th 349, 371; *People v. DeSantis* (1992) 2 Cal.4th 1198, 1226.) " '[A] court need not expressly weigh prejudice against probative value or even expressly state that it has done so, if the record as a whole shows the court was aware of and performed its balancing function under Evidence Code section 352.' " (*People v. Lewis* (2009) 46 Cal.4th 1255, 1285.) We will reverse only if the court's ruling was "arbitrary, whimsical, or capricious as a matter of law." (*People v. Linkenauger* (1995) 32 Cal.App.4th 1603, 1614; *People v. Branch* (2001) 91 Cal.App.4th 274, 282 (*Branch*).)

*C. Analysis*

Defendant asserts the trial court abused its discretion in admitting evidence of uncharged acts from four different witnesses. Defendant challenges the court's determination that this evidence was very probative, and that the evidence was not

45.

cumulative. Defendant asserts the trial court did not take into account the age of the events or the fact that they did not result in convictions.

Our Supreme Court has determined that the admission of evidence regarding a defendant's propensity to commit a sex act under Evidence Code section 1108 does not violate the defendant's right to due process of law. (*Falsetta, supra,* 21 Cal.4th at pp. 910, 922.) Here, both the current offenses and the offenses involving the incident with Jane Doe 1 in Mexico, Jane Doe 4, Jane Doe 5, and the pretext phone call were qualifying "sexual offenses" under Evidence Code section 1108, subdivision (d). Thus, unless the testimony was inadmissible under Evidence Code section 352, the trial court did not err in allowing the prosecution to present it to the trier of fact. (See *Falsetta, supra,* at p. 916; *Branch, supra,* 91 Cal.App.4th at p. 281.)

Upon review of the record, we conclude the court properly exercised it discretion by deciding "the probative value of this evidence was outweighed by its prejudicial impact." (*People v. Leon* (2001) 91 Cal.App.4th 812, 816.) First, the record shows the court "weigh[ed] the evidence's probative value against the dangers of prejudice, confusion, and undue time consumption." (*People v. Cudjo* (1993) 6 Cal.4th 585, 609.) The court considered the pretext phone call of defendant's confession to molesting Jane Doe 6 to be very probative and not more prejudicial than probative. The uncharged sexual offense evidence was highly probative under Evidence Code section 1108, as evidence of a "prior sexual offense is indisputably relevant in a prosecution for another sexual offense." (*People v. Fitch* (1997) 55 Cal.App.4th 172, 179.)

Second, the record does not indicate that the trial court found the uncharged evidence more inflammatory than the other evidence. (See *Nguyen, supra*, 184 Cal.App.4th at p. 1117.) Defendant's methods of sexual abuse of his young victims remained the same or similar between the victims, and thus it is unlikely that the jury would have been so prejudiced against defendant as a consequence of the Evidence Code 1108 evidence. (See *Branch*, *supra,* 91 Cal.App.4th at pp. 283–284 [the offenses were

very similar to the ones involving S. and unlikely the jury would have been so prejudiced against defendant as a consequence of B.'s "inflammatory" testimony].)

Third, while remoteness is a factor, no specific time has been established for determining when an uncharged offense is too remote to be admissible. (*Harris*, *supra*, 60 Cal.App.4th at p. 739 [no bright line]; *People v. Ewoldt* (1994) 7 Cal.4th 380, 405 [12-year gap was not too great].) In *People v. Waples* (2000) 79 Cal.App.4th 1389, 1393–1395, the court found uncharged sexual offenses involving same victim 15 to 22 years before trial was not too remote where the similarities balanced out the remoteness. Here, Jane Doe 4's incident occurred around 2002 and Jane Doe 5's incident occurred around 1998. However, since the uncharged and charged offenses are remarkably similar, the similarity in the offenses balance out the remoteness. (See *Branch*, *supra*, 91 Cal.App.4th at p. 285 ["[I]f the prior offenses are very similar in nature to the charged offenses, the prior offenses have greater probative value in proving propensity to commit the charged offenses."].)

Fourth, there is nothing in the record to indicate the propensity evidence confused the jury or distracted them from their main inquiry. (See *Nguyen*, *supra*, 184 Cal.App.4th at p. 1117.) Where the "prior offense did not result in a conviction, that fact increases the danger that the jury may wish to punish the defendant for the uncharged offenses and increases the likelihood of confusing the issues 'because the jury [has] to determine whether the uncharged offenses [in fact] occurred.' " (*Branch, supra,* 91 Cal.App.4th at p. 284; *Harris*, *supra*, 60 Cal.App.4th at pp. 738–739 [same approach to Evid. Code, § 1108 evidence].) In *Branch,* the victim of the uncharged sexual offenses testified that she "reported them to a police officer on one occasion and that 'nothing' came of that report." (*Branch*, *supra*, 91 Cal.App.4th at p. 284.) Thus, the court weighed the possibility that the jury may have wanted to punish defendant for committing the prior uncharged offenses, rather than assessing his guilt or innocence of the charged offenses. (*Ibid*; see *Ewoldt*, *supra*, 7 Cal.4th at p. 405.) Here, Jane Doe 4 testified that she reported

the incident to police in 2005 but did not say whether anything happened from that report. However, there was testimony that nothing was going to happen regarding Jane Doe 6. (See *Branch, supra,* at p. 284.) Even so, like in *Branch*, there was nothing in the record indicating the jury wanted to punish defendant for his prior offenses. The jury did not find defendant guilty of every offense charged, but were unable to reach a verdict on two of the charges, demonstrating they were not influenced to seek revenge for the other noncharged victims. (See *Branch, supra*, at p. 284.)

The last factor is the consumption of time involved in addressing the prior offenses, which defendant does not specifically argue on appeal. Upon review, the record shows the trial court carefully considered the time it would take and that the witness testimony was estimated to be very short. As a precaution, the trial court admitted the evidence without prejudice for the defendant to interject an objection if the evidence got too long or became too cumulative. Defense counsel never objected to the uncharged sexual offense evidence as cumulative.

Consequently, we conclude that since the probative value of the uncharged offenses was high and the Evidence Code 352 factors did not weigh heavily in favor of excluding the evidence, the trial court did not abuse its discretion in admitting the Evidence Code section 1108 evidence. Regardless, defendant fails to demonstrate he was prejudiced. As discussed *ante,* the uncharged offenses were similar and not more inflammatory that the charges defendant was already facing. Moreover, the jury was instructed on the proper legal standard in considering the uncharged offenses. We presume the jury followed those instructions. (See *People v. Winbush* (2017) 2 Cal.5th 402, 457 (*Winbush*).) And the fact that the jury did not reach a verdict on some of the charged offenses shows that the Evidence Code section 1108 evidence did not prejudice the jury against defendant. Therefore, it is not reasonably probable the jury would have rendered a more favorable verdict even if some of the propensity evidence of uncharged sexual conduct had been excluded. (See *Watson, supra,* 46 Cal.2d at p. 836; *Nguyen*,

*supra*, 184 Cal.App.4th at p. 1120 [applying *Watson* standard]; *Harris*, *supra*, 60 Cal.App.4th at p. 741 [applying *Watson* standard].)

## V. THE CORPUS DELICTI RULE DOES NOT APPLY TO DEFENDANT'S CONFESSION OF AN UNCHARGED CRIME

Defendant seeks reversal of his convictions arguing the prosecutor was allowed to rely on an uncorroborated statement for the purpose of establishing an uncharged prior crime for which there was no corpus delecti established. The People disagree arguing the corpus delicti rule does not apply to Evidence Code section 1108 evidence. We agree the corpus delicti rule does not apply here.

### A. Relevant Facts

Defendant's daughter, K.M., called police after defendant called her from the mental hospital and told her he had sexually touched her daughter. K.M. called the police, who asked her to participate in a pretext call to record defendant's confession. Officer Steely suggested a few questions for K.M. to ask defendant during the recorded phone call. At the officer's prompting, K.M. asked defendant "[w]hat did he do?" and "[h]ow did he do it?" The phone call records defendant admitting to touching Jane Doe 6 "in the private" and "[w]hen she was asleep." Defendant told K.M. he was sick and wanted to die.

Before trial, defendant moved to exclude the phone call evidence of defendant's admissions based on involuntariness and lack of corpus. At the hearing on the prosecution's in limine motion to admit defendant's statement, defense counsel noted that "while [Evidence Code section] 1108 evidence doesn't necessarily need corpus, if you combine a lack of corpus, which may be here in this case or may not, with the hospitalization, we think that due process would dictate that we not allow the statement in." Because of this, defendant argued that his statement was not freely and willfully given under these circumstances. The prosecutor argued that the corpus rule did not apply to evidentiary rulings under Evidence Code section 1108, citing *People v. Denis*

49.

(1990) 224 Cal.App.3d 563 (*Denis*).  There was "no evidence that simply because he was in a mental hospital or some sort of hospital that the statement should not be admitted. We don't know what his mental state was beyond the accusations that are being conveyed today."

The court agreed stating, "at this point in time, I am going to allow [defendant's] statement to come in through the pretext phone call.  It does show [Evidence Code section] 1108 evidence.  [¶]  At this point, there's no evidence that it was coerced in any way on an involuntary bases or the circumstances; although, I wouldn't necessarily think that *Miranda* applies at this point in time, based on he was not in the custody of the law enforcement officer.  But you have to evaluate statements whether or not they are voluntary and/or coerced.  [¶]  And at this point, I have no evidence to indicate that it was not voluntary and not coerced, excuse me, and coerced and so the statement is allowed."

The jury was instructed on corpus delicti, as follows: "The defendant may not be convicted of any crime based on his out-of-court statement alone. You may rely on the defendant's out-of-court statement to convict him only if you first conclude that the other evidence shows that the charge was — excuse me, the charged crime was committed." "That other evidence may be slight and need only be enough to support a reasonable inference that a crime was committed.  This requirement of other evidence does not apply to proving the identity of the person who committed the crime.  If other evidence shows that the charged crime was committed, the identity of the person who committed it may be proved by the defendant's statement alone.  You may not convict the defendant unless the People have proved his guilt beyond a reasonable doubt."

B.  *Standard of Review and Applicable Law*

"The corpus delicti rule requires that the corpus delicti of a crime be proved independently from an accused's extrajudicial admissions." (*People v. Jennings* (1991) 53 Cal.3d 334, 364; *People v. Martinez* (1996) 51 Cal.App.4th 537, 543.)  " ' "The

50.

corpus delicti of a crime consists of two elements, the fact of the injury or loss or harm, and the existence of a criminal agency as its cause." ' " (*People v. Zapien* (1993) 4 Cal.4th 929, 985–986.)  The corpus delicti rule requires the prosecution to "prove the corpus delicti, or the body of the crime itself" independently of a defendant's own statements.  (*People v. Alvarez* (2002) 27 Cal.4th 1161, 1168 (*Alvarez*).)  "The purpose of the corpus delicti rule is to satisfy the policy of the law that 'one will not be falsely convicted, by his or her untested words alone, of a crime that never happened.' " (*People v. Miranda* (2008) 161 Cal.App.4th 98, 107; see also *Alvarez, supra,* at p. 1169.)

Generally, the rule applies to crimes for which a defendant is on trial, and courts have not extended the rule to other crimes with which a defendant is not charged.  (*Denis, supra,* 224 Cal.App.3d at pp. 568–570 [corpus delicti rule did not apply to "uncharged conduct, offered for a limited purpose under Evidence Code section 1101, subdivision (b)"]; *People v. Davis* (2008) 168 Cal.App.4th 617, 633 (*Davis*) [corpus delicti rule does not apply generally to uncharged conduct].)

Our high court stated that Proposition 8 generally made all relevant evidence admissible in criminal cases and precludes a defendant from succeeding with a corpus delicti objection to evidence.  (*Alvarez, supra*, 27 Cal.4th at pp. 1164–1165; *Davis, supra,* 168 Cal.App.4th at p. 634.)  However, Proposition 8 "did not abrogate the corpus delicti rule insofar as it provides that every conviction must be supported by some proof of the corpus delicti aside from or in addition to such statements, and that the jury must be so instructed." (*Alvarez, supra,* at p. 1165, italics omitted; *Davis, supra,* at p. 634.)

Any error in admitting such evidence is reviewed by the *Watson* standard.  (*People v. Fuiava* (2012) 53 Cal.4th 622, 719, fn. 36 [assessing claim of corpus delicti error in penalty phase under state law standard]; *Alvarez, supra*, 27 Cal.4th at p. 1181; *People v. Winkler* (2020) 56 Cal.App.5th 1102, 1164.)

*C. Analysis*

Defendant argues his conviction should be reversed because the prosecutor was allowed to rely on an uncorroborated statement from defendant that he committed an uncharged act of sexual molestation for which there was no corpus delicti. Defendant argues that the holding in *Denis* should not apply to an uncharged crime allegation introduced under Evidence Code section 1108. He argues that propensity evidence under Evidence Code section 1108 is significantly broader than proof of a single element of a crime, such as motive or identity. The People disagree arguing that the corpus delicti rule does not apply to Evidence Code section 1108 evidence.

In *Denis*, defendant's admission to uncharged crimes was admitted under Evidence Code section 1101 without independent proof that such crime was committed. (*Denis, supra,* 224 Cal.App.3d at pp. 568–570.) The *Denis* court noted that the corpus delicti rule is based in common law and that there was no application of the corpus delicti rule to uncharged offenses found "in the secondary sources. (See 7 Wigmore, [Evidence (Chadbourn rev. 1979)] §§ 2070-2074, 2081; McCormick, Evidence (3d ed. 1984) §§ 145, 190; 2 Jefferson, Cal. Evidence Benchbook (Cont.Ed.Bar 1982 & 1990 supp.) §§ 33.1-33.8; 1 Witkin & Epstein, California Criminal Law (2d ed. 1988) §§ 136-142; 1 Witkin, Cal. Evidence (3d ed. 1986) §§ 356-379; Annots. (1940) 127 A.L.R. 1130, (1956) 45 A.L.R.2d 1316, (1965) 4 A.L.R.3d 671; Comment, *California's Corpus Delicti Rule: The Case for Review and Clarification*, 20 UCLA L.Rev. 1055; Imwinkelried, Uncharged Misconduct Evidence (1984) §§ 6.04, 6.19-6.20, 8.04, 9.21, 9.28-9.45, 9.49, 9.52-9.53.)" (*Denis, supra,* at p. 570.) *Denis* further noted that "both Wigmore and McCormick question the need for the corpus delicti rule itself. (Wigmore, *supra,* § 2070, at p. 510; McCormick, *supra,* § 145, at pp. 370-371.)" (*Denis, supra,* at p. 570.) The *Denis* court was "unwilling to expand the rule to cover evidence of uncharged conduct, offered for a limited purpose under Evidence Code section 1101, subdivision (b)."

(*Denis*, *supra,* at p. 570; see also *Davis*, *supra*, 168 Cal.App.4th at p. 633 [corpus delicti rule does not apply generally to uncharged conduct].)

Our high court has also questioned the application of the corpus delicti rule to uncharged offenses.  (See *People v. Clark* (1992) 3 Cal.4th 41, 124 ["It is not clear that the corpus delicti rule applies to other crimes evidence offered solely to prove facts such as motive, opportunity, intent, or identity, or for impeachment."], abrogated on other grounds as stated in *People v. Edwards* (2013) 57 Cal.4th 658, 705.)

In the same vein, there has been no support for expanding the corpus delicti rule to cover evidence of uncharged conduct, offered for a limited purpose, under Evidence Code section 1108.  As the Third District Court of Appeal stated in *Davis*, "[a]lthough the corpus delicti rule applies to uncharged conduct introduced at the penalty phase of a capital trial, it does not apply generally to uncharged conduct." (*Davis*, *supra*, 168 Cal.App.4th at p. 633, italics omitted.)  The purpose of the corpus delicti rule is to ensure that an accused will not be falsely convicted based on an untested statement for a crime that never occurred.  (*People v. Ochoa, supra,* 19 Cal.4th at p. 405.)  Such danger does not exist here where defendant's admission to touching Jane Doe 6, an uncharged crime, was admitted for the limited purpose of showing a disposition or inclination for similar crimes.

The California Supreme Court noted that Proposition 8 "abolishe[d], with specified exceptions, all state law restrictions on the admissibility of relevant evidence, necessarily including the prong of the corpus delicti rule that bars introduction of an accused's out-of-court statements absent independent proof a crime was committed." (*Alvarez*, *supra*, 27 Cal.4th at p. 1179, italics omitted.)  As such, the corpus delicti rule is no longer a basis for excluding an accused's statement regarding participation in a crime. (*Ibid*; see *People v. Valencia* (2008) 43 Cal.4th 268, 297 [*Alvarez* made clear that the corpus delicti rule no longer prevents admission of the confession into evidence]; *Davis*, *supra*, 168 Cal.App.4th at p. 634 [Proposition 8 generally made "all relevant evidence

admissible in criminal cases."].) Accordingly, we reject defendant's claim that the corpus delicti rule should be expanded to defendant's admission of an uncharged offense offered under Evidence Code section 1108.

We are not persuaded by defendant's reliance on *People v. Valencia, supra,* 43 Cal.4th 268 or *People v. Hamilton* (1963) 60 Cal.2d 105, overruled on other grounds in *People v. Morse* (1964) 60 Cal.2d 631. Both *Valencia* and *Hamilton* held that the corpus delicti rule applies to a defendant's confession of nonadjudicated crimes at the penalty phase of a capital trial. (*Valencia, supra,* at pp. 296–297; *Hamilton, supra,* at p. 129.) This case is not a capital case and defendant's confession was introduced during the trial and not in the penalty phase. In *People v. Mattson* (1984) 37 Cal.3d 85, the court clarified that the People were not required to establish the corpus delicti of an underlying felony used to convict an accused of murder on a felony-murder theory (*People v. Cantrell* (1973) 8 Cal.3d 672, 680–681, disapproved of on other grounds in *People v. Flannel* (1979) 25 Cal.3d 668, 684, fn. 12), but that the "general law" proviso incorporated the corpus delicti requirement for felonies supporting special circumstance allegations, which if found true, would subject the defendant to a penalty phase and possibly to the punishment of death. (*Mattson*, *supra,* at pp. 93–94.) Here, defendant's admission is not being used to support a special circumstance allegation, which would subject defendant to a penalty phase. Last, defendant's reliance on *Arizona v. Fulminante* (1991) 499 U.S. 279, 296 is irrelevant since *Fulminante* addressed the voluntariness of the defendant's confessions to the crime he was charged, and not a confession to uncharged crimes.

Finally, even if the trial court erred in admitting defendant's statement, it would not warrant reversal of the judgment. We assess prejudice relating to the corpus delicti rule under *Watson.* (See *People v. Fuiava, supra,* 53 Cal.4th at p. 719, fn. 36; *Alvarez*, *supra*, 27 Cal.4th at p. 1181.) Under *Watson*, " 'we will affirm the judgment unless we conclude there is a reasonable (i.e., realistic) possibility that the jury would have rendered

a different verdict had the error or errors not occurred.' " (*Fuiava*, *supra*, 53 Cal.4th at p. 719.) Here, Jane Doe 1, Jane Doe 2, Jane Doe 3, Jane Doe 4 and Jane Doe 5 all testified in detail that defendant molested them. Yet even with defendant's confession to molesting Jane Doe 6, the jury did not reach a verdict on counts 2 and 4. Thus, the verdicts themselves reveal that defendant's admission did not have an overly prejudicial impact. Further, the jury was instructed on the corpus delicti rule that defendant may not be convicted of any crime based on his out-of-court statement alone. We presume the jury followed the court's instructions. (See *Winbush, supra,* 2 Cal.5th at p. 457.) Therefore, defendant fails to show a reasonable probability that the jury would have rendered a different verdict had defendant's confession not been admitted.

## VI.    DEFENDANT'S ADMISSION WAS NOT INVOLUNTARY MADE.

Defendant claims that his pretext statements were made involuntarily and require reversal. The People disagree stating that nothing in K.M.'s questioning was so coercive as to overcome defendant's free will. We agree with the People and reject defendant's claim that his statements were involuntarily made.

### A.  *Relevant Facts*

Defendant objected to the admission of his pretext confession for a lack of corpus and for not being freely and voluntarily made since defendant was in the hospital. The court allowed the pretext phone call to be admitted into evidence finding there was "no evidence that it was coerced in any way on an involuntary bases or the circumstances."

### B.  *Applicable Law and Standard of Review*

"[T]he due process clause of the Fourteenth Amendment to the United States Constitution makes inadmissible any involuntary statement obtained by a law enforcement officer from a criminal suspect by coercion." (*People v. Neal* (2003) 31 Cal.4th 63, 79.) "A finding of coercive police activity is a prerequisite to a finding that a confession was involuntary under the federal and state Constitutions." (*People v. Maury*

(2003) 30 Cal.4th 342, 404.)  Confessions are involuntary if they are obtained by threats or violence, direct or implied promises, or other improper influences.  (*People v. Benson* (1990) 52 Cal.3d 754, 778.)  Coercive police activity can be the result of either "physical intimidation or psychological pressure."  (*Townsend v. Sain* (1963) 372 U.S. 293, 307, overruled on other grounds in *Keeney v. Tamayo-Reyes* (1992) 504 U.S. 1, 5; *Blackburn v. Alabama* (1960) 361 U.S. 199, 206.)  "A statement is involuntary if it is not the product of a ' "rational intellect and free will." ' "  (*Maury, supra,* at p. 404.)

In determining whether a defendant's will was overborne, all the surrounding circumstances are examined, including the characteristics of the accused and the details of the interrogation.  (*Maury, supra,* 30 Cal.4th at p. 404; *People v. Linton* (2013) 56 Cal.4th 1146, 1176 [whether a confession was voluntary depends on the totality of the circumstances]; *People v. Benson, supra,* 52 Cal.3d at p. 779.)  Relevant factors include: " ' "the crucial element of police coercion [citation]; the length of the interrogation [citation]; its location [citation]; its continuity" as well as "the defendant's maturity [citation]; education [citation]; physical condition [citation]; and mental health." ' " (*People v. Massie* (1998) 19 Cal.4th 550, 576; *People v. Williams, supra,* 49 Cal.4th at p. 436 [no single factor is dispositive]; *Winbush, supra,* 2 Cal.5th at p. 452 [same].)

"On appeal, we conduct an independent review of the trial court's legal determination and rely upon the trial court's findings on disputed facts if supported by substantial evidence."  (*People v. Williams, supra,* 49 Cal.4th at p. 425; *Winbush, supra*, 2 Cal.5th at p. 452 [same].)

*C. Analysis*

Defendant asserts that K.M. was acting as a police agent when she recorded the pretext call with defendant while an officer gave her questions to ask.  Defendant claims that his statements were involuntary because K.M. and the officer took advantage of his mental illness.  The People claim that even if K.M. was acting as a police agent, nothing

in the record indicates K.M.'s questions to defendant were so coercive as to overcome defendant's free will.

A review of the record demonstrates the court properly concluded defendant's confession was voluntary beyond a reasonable doubt. Regardless of whether K.M. was acting as a police agent or not, there is nothing in the record to indicate defendant's confession was involuntary or otherwise coerced. (See *Colorado v. Connelly* (1986) 479 U.S. 157, 167 [coercive police activity is a necessary predicate to finding a confession was not voluntary]; *Benson*, *supra*, 52 Cal.3d at p. 778 [same].) First, defendant was the one who initiated contact with K.M. and confessed that he inappropriately touched Jane Doe 6. When K.M. called him back in order to record their conversation, she simply asked follow up questions about what he already said to her. The questions K.M. asked defendant, such as "where [did] you touch her" and "[w]hen did you do that" were simply asking defendant to clarify his previous self-initiated confession. Everything was "aboveboard" and there is no evidence that K.M. was heavy-handed, threatened defendant or made false promises of leniency to defendant in order to elicit an involuntary confession from him. (See *People v. Benson, supra,* 52 Cal.3d at pp. 779–780.)

We further agree with the trial court that defendant's mental state at the time of the telephone confession did not render his confession involuntary. "[W]hile mental condition is surely relevant to an individual's susceptibility to police coercion, mere examination of the confessant's state of mind can never conclude the due process inquiry." (*Colorado v. Connelly, supra,* 479 U.S. at p. 165.) Cases where confessions made by defendants with deficient mental conditions were considered involuntary were due to the overreaching police tactics. (*Ibid*; see *Blackburn v. Alabama, supra,* 361 U.S. at pp. 207–208 [police exploited the mental weakness with coercive tactics such as eight-to nine-hour sustained interrogations]; *Townsend v. Sain, supra,* 372 U.S. at pp. 298–299 [use of a truth-serum rendered the confession involuntary].) Therefore, since there was

57.

no evidence of coercion, false promises or any exploitation of defendant's mental state, his mental state alone did not render his confession involuntary. As such, defendant's claim fails.

## VII. SUFFICIENT EVIDENCE SUPPORTS THE CONVICTION FOR COUNT 1.

Defendant claims there is insufficient evidence of the sexual intent element of lewd and lascivious touching to support the conviction for count 1. The People disagree arguing there is substantial evidence to support the conviction. We conclude there is substantial evidence of defendant's lewd intent to support the conviction.

### A. *Relevant Facts*

The prosecution's theory for count 1 was that rubbing Jane Doe 1's back after she complained about a headache was the basis for the conviction. Jane Doe 1 testified that defendant rubbed her neck and shoulders, to help her headache go away. Defendant then went slowly down her lower back before saying, "I'm sorry." When Jane Doe 1 turned to look behind her, she saw that defendant had his erect, exposed penis.

### B. *Applicable Law and Standard of Review*

"In reviewing the sufficiency of evidence under the due process clause of the Fourteenth Amendment to the United States Constitution, the question we ask is 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (*People v. Rowland* (1992) 4 Cal.4th 238, 269, quoting *Jackson v. Virginia* (1979) 443 U.S. 307, 319; *People v. Young* (2005) 34 Cal.4th 1149, 1175.) "We apply an identical standard under the California Constitution." (*Young, supra*, at p. 1175.) "In determining whether a reasonable trier of fact could have found defendant guilty beyond a reasonable doubt, the appellate court 'must view the evidence in a light most favorable to respondent and presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.' " (*People v. Johnson*

(1980) 26 Cal.3d 557, 576; *Young, supra,* at p. 1175 [same]; *People v. Kelly* (1992) 1 Cal.4th 495, 528; *People v. Pensinger* (1991) 52 Cal.3d 1210, 1237.) Substantial evidence is evidence "'of ponderable legal significance[,] reasonable in nature, credible, and of solid value.' " (*Johnson, supra,* at p. 576.)

"Before the judgment of the trial court can be set aside for insufficiency of the evidence to support the verdict of the jury, it must clearly appear that upon no hypothesis whatever is there sufficient substantial evidence to support it." (*People v. Redmond* (1969) 71 Cal.2d 745, 755; *People v. Rolon* (2008) 160 Cal.App.4th 1206, 1221 [no discernable support for the verdict].) The appellate court does not reweigh the evidence but defers to the factfinder's credibility determinations and reasonable inferences based on the evidence. (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206; *People v. Misa* (2006) 140 Cal.App.4th 837, 842.) The test is not whether the reviewing court believes that the evidence presented at trial established guilt beyond a reasonable doubt, but rather whether any rational trier of fact could have found that the elements of the crime were established beyond a reasonable doubt. (*People v. Towler* (1982) 31 Cal.3d 105, 117–118.)

Section 288, subdivision (a) states in relevant part: "a person who willfully and lewdly commits any lewd or lascivious act, … upon or with the body, or any part or member thereof, of a child who is under the age of 14 years, with the intent of arousing, appealing to, or gratifying the lust, passions, or sexual desires of that person or the child, is guilty of a felony." "*Any* touching of a child under the age of 14 violates this section, even if the touching is outwardly innocuous and inoffensive, if it is accompanied by the *intent* to arouse or gratify the sexual desires of either the perpetrator or the victim." (*People v. Lopez* (1998) 19 Cal.4th 282, 289, original italics; *People v. Martinez* (1995) 11 Cal.4th 434, 444–445.) "[T]he trier of fact looks to all the circumstances, including the charged act, to determine whether it was performed with the required specific intent." (*People v. Scott* (1994) 9 Cal.4th 331, 344, fn. 7.) All of the circumstances surrounding

the touching, including the defendant's extrajudicial statements, other acts of lewd conduct admitted or charged in the case, the relationship of the parties, and any coercion, bribery, or deceit used to obtain the victim's cooperation or avoid detection are relevant to determining whether it was performed with the required specific intent. (*Martinez, supra,* at p. 445.)

### C. Analysis

Defendant contends there is insufficient evidence to support the sexual intent element of lewd touching for count 1. Defendant argues there was only speculation that defendant was rubbing Jane Doe 1's shoulders for sexual stimulation. Defendant claims it was not unusual for defendant to massage her shoulders, and the fact that defendant apologized and had his hand on his erect penis outside of his boxers reasonably suggests defendant's erection was involuntary and he was trying to hide it. Jane Doe 1 did not know if defendant was doing anything with his penis. The People claim there is ample evidence to support the jury's guilty verdict on count 1. The People contend that the fact that defendant rubbed Jane Doe 1's back while having his hand on his own erect penis is ample evidence of his lewd intent. And his statement "I'm sorry" shows his own guilt.

"Criminal intent will rarely be shown by direct evidence and must frequently be inferred from a defendant's conduct." (*People v. Gilbert* (1992) 5 Cal.App.4th 1372, 1380.) In *Gilbert*, the defendant argued that the victim's testimony "that he had rubbed her stomach, back and thigh was insufficient to support the 'lewd and lascivious act' requirement of subdivision (a) of Penal Code section 288." (*Ibid.*) The court disagreed, stating that "[t]he crime is committed by any touching of a child with the requisite intent." (*Ibid.*) The *Gilbert* court concluded the jury reasonably could have found, beyond a reasonable doubt, the requisite intent based on defendant's pattern of conduct with other young girls. (*Ibid.*) Similarly, here, the prosecutor introduced other evidence of defendant's sexual intent with other young girls at trial, which allowed the jury to

consider and conclude, beyond a reasonable doubt, that defendant had the requisite intent when he rubbed Jane Doe 1's back. Even more so here, defendant's erection was evidence of defendant's sexual arousal from rubbing her back. Therefore, we conclude substantial evidence established the elements of lewd and lascivious conduct for count 1 beyond a reasonable doubt. (See *Gilbert, supra,* at pp. 1380–1381.)

VIII.   CALCRIM No. 1191.

Last, defendant contends the trial court erred in instructing the jury with CALCRIM No. 1191 alleging the instruction allowed the jury to find claims of prior uncharged crimes under the lesser preponderance of the evidence standard to conclude the same witness was telling the truth about the charged crimes. The People reject defendant's contention and assert that CALCRIM No. 1191 instructs the jury with the proper burden of proof. We find no error and reject defendant's claim.

*A.  Relevant Facts*

The jury was instructed with CALCRIM No. 1191 as follows:

"The People presented evidence that the defendant committed the crime of lewd acts upon a child under the age of 14, … [section] 288(a); to wit Jane Doe [1] and that's related to the Mexico event; Jane Doe [5] and [6]; and then the crime of lascivious acts on a 14-, 15-year-old child, … [s]ection 288(c)(1) with Jane Doe [4] that were not charged in this case. These crimes are defined for you in these instructions."

"You may consider this evidence only if the People have proved by a preponderance of the evidence that the defendant, in fact, committed the uncharged crimes.

"Proof by a preponderance of the evidence is a different burden of proof from proof beyond a reasonable doubt. A fact is proved by a preponderance of the evidence if you conclude that it is more likely than not that the fact is true. If the People have not met this burden of proof, you must disregard this evidence entirely.

"If you decide that the defendant committed the uncharged offenses, you may but are not required to conclude from that evidence that the defendant was disposed or inclined to commit sexual offenses, and based on that

61.

decision also conclude that the defendant was likely to commit lewd acts upon a child, as charged here.

"If you conclude that the defendant committed the uncharged offenses, that conclusion is only one factor to consider along with all the other evidence. It is not sufficient by itself to prove that the defendant is guilty of a lewd act upon a child. The People must still prove that charge or the charge beyond a reasonable doubt. Do not consider this evidence for any other purpose."

Defense counsel did not object to CALCRIM 1191.

The court also instructed the jury as follows, regarding charged offenses used to show defendant was inclined to commit sexual offenses:

"The People presented evidence that the defendant committed the crime of lewd act upon a child, as charged in Counts 1 through 5. If the People have proved beyond a reasonable doubt that the defendant committed one or more of these crimes, you may but are not required to conclude from the evidence that the defendant was disposed or inclined to commit sexual offenses, and based on that decision also conclude that the defendant was likely to commit and did commit the other sex offenses charged in this case.

"If you find that the defendant committed one or more of these crimes, that conclusion is only one factor to consider along with all the other evidence. It is not sufficient by itself to prove that the defendant is guilty of another crime. The People must still prove the charge and allegation beyond a reasonable doubt."

*B. Applicable Law and Standard of Review*

We review de novo whether a jury instruction correctly states the law. (*People v. Posey* (2004) 32 Cal.4th 193, 218.) Our task is to determine whether the trial court " 'fully and fairly instructed on the applicable law.' " (*People v. Ramos* (2008) 163 Cal.App.4th 1082, 1088.)

In determining whether error has been committed in giving or not giving jury instructions, "[w]e look to the instructions as a whole and the entire record of trial, including the arguments of counsel." (*People v. Franco* (2009) 180 Cal.App.4th 713, 720; *People v. Stone* (2008) 160 Cal.App.4th 323, 331; *People v. Yoder* (1979) 100 Cal.App.3d 333, 338.) We " 'assume that the jurors are intelligent persons and capable

62.

of understanding and correlating all jury instructions which are given.' " (*Yoder*, *supra*, at p. 338; *People v. Ramos*, *supra*, 163 Cal.App.4th at p. 1088.) " 'Instructions should be interpreted, if possible, so as to support the judgment rather than defeat it if they are reasonably susceptible to such interpretation.' " (*Ramos*, *supra*, at p. 1088.)

The validity of a jury instruction is a question of law reviewed de novo. (*People v. Berryman* (1993) 6 Cal.4th 1048, 1089, overruled on other grounds by *People v. Hill* (1998) 17 Cal.4th 800.) If the trial court gives an instruction that incorrectly states the law, no objection below is necessary to preserve the claim on appeal to the extent it affects his substantial rights. (§ 1259; *People v. Hudson* (2006) 38 Cal.4th 1002, 1012; *People v. Prieto* (2003) 30 Cal.4th 226, 247; *People v. Lawrence* (2009) 177 Cal.App.4th 547, 553, fn. 11 [no objection needed to preserve claim of instructional error when it affects substantial rights].) "Instructional error affects a defendant's substantial rights if the error was prejudicial under the applicable standard for determining harmless error." (*People v. Franco, supra,* 180 Cal.App.4th at p. 720; see also *People v. Konow* (2004) 32 Cal.4th 995, 1024 [substantial rights are affected if the error might reasonably have affected the outcome of the trial].) "In this regard, '[t]he cases equate "substantial rights" with reversible error' under the test stated in [*Watson, supra,*] 46 Cal.2d 818." (*People v. Felix* (2008) 160 Cal.App.4th 849, 857; *People v. Arredondo* (1975) 52 Cal.App.3d 973, 978.)

*C. Analysis*

Defendant argues that CALCRIM No. 1191 "impermissibly allowed the jury to find dubious, generic claims of prior uncharged crimes under a preponderance standard, to conclude that the very same witness, Doe 1, was telling the truth about the charged crimes." Defendant contends that "when uncharged offenses are based solely on the victim's testimony the jury should be given a modified version of CALCRIM 1191 making it clear that the uncharged act must be proved beyond a reasonable doubt."

First, although we note that defendant failed to object to CALCRIM No. 1191 below, the rule of forfeiture does not apply if the instruction was an incorrect statement of the law (*People v. Hudson, supra,* 38 Cal.4th at p. 1012) or if the instructional error affected the defendant's substantial rights. (§ 1259; *People v. Ramos*, *supra*, 163 Cal.App.4th at p. 1087.) " 'Ascertaining whether claimed instructional error affected the substantial rights of the defendant necessarily requires an examination of the merits of the claim ... .' " (*People v. Lawrence, supra,* 177 Cal.App.4th at p. 553, fn. 11; *People v. Andersen* (1994) 26 Cal.App.4th 1241, 1249.)

In *People v. Gonzales* (2017) 16 Cal.App.5th 494 (*Gonzales*), the defendant was charged and convicted of various counts of child molestation against a child, L.W. (*Id.* at pp. 496–497.) The prosecution introduced evidence of uncharged sex offenses through L.W.'s testimony, not through third parties. (*Id.* at p. 496.) The defendant argued that CALCRIM No. 1191 improperly allowed L.W. to corroborate her own testimony. (*Gonzales, supra,* at p. 500.) Although the court expressed its concern with CALCRIM No. 1191 instructing on evidence of uncharged sex offenses against the victim and Evidence Code section 1108, the court affirmed the judgment. (*Gonzales, supra,* at pp. 496–497.) The court stated that defendant's issue related more to the admissibility of the victim's evidence of uncharged misconduct rather than the instruction. (*Id.* at p. 500.) Evidence Code section 1108 permits evidence of uncharged sexual conduct by the testimony of the victim, subject to Evidence Code section 352 analysis. (*Gonzales, supra,* at p. 502; see *People v. Reliford* (2003) 29 Cal.4th 1007, 1012–1013; *People v. Ennis* (2010) 190 Cal.App.4th 721, 733 [evidence of uncharged crimes from same witness is admissible].) The court concluded that where the trial court complies with Evidence Code section 1108, CALCRIM No. 1191 is an appropriate instruction. (*Gonzales*, *supra*, at p. 502.)

The *Gonzales* court rejected the defendant's claim that the testimony by the victim of uncharged sexual offenses would irrationally corroborate the victim's testimony of the

charged sexual offenses. (*Gonzales*, *supra*, 16 Cal.App.5th at p. 502.) The *Gonzales* court concluded "there is nothing irrational about a victim supporting her testimony with testimony of uncharged sexual offenses. We agree, however, that such testimony is not as probative as similar testimony from a third party. But it is still probative." (*Ibid*; see *People v. Stanley* (1967) 67 Cal.2d 812, 818 [court refused to adopt rigid rule excluding such evidence]; *Ennis*, *supra*, 190 Cal.App.4th at p. 733 [upholding trial court's determination such evidence was more probative than unduly prejudicial].) As such, "CALCRIM No. 1191 does not violate due process." (*Gonzales*, *supra*, at p. 502.)

Defendant points to the concurring opinion of Justice Perren in *Gonzales* who disagreed that CALCRIM No. 1191 was proper, but agreed that Gonzales was not prejudiced. (*Gonzales*, *supra*, 16 Cal.App.5th at p. 505, conc. opn. of Perren, J.) Justice Perren believed that "for practical purposes, the instruction lowered the standard of proof for the determination of guilt." (*Id*. at p. 507.) Justice Perren states that, "In my view, a jury instruction explaining the admissibility of uncharged offenses against the victim as proof of propensity under Evidence Code section 1108 must resemble the instruction used in [*People v. Villatoro* (2012) 54 Cal.4th 1152]." *Villatoro* specified "that a currently charged offense must be proved beyond a reasonable doubt before it can be used as propensity evidence in support of another currently charged offense." (*Gonzales, supra,* at p. 507, quoting *People v. Cruz* (2016) 2 Cal.App.5th 1178, 1186.) However, *Villatoro* and *Cruz* addressed the use of CALCRIM No. 1191 for "evidence of sexual offenses *charged in the current prosecution* to be used to show a propensity to commit other charged offenses in the same case." (*Cruz*, *supra*, at p. 1185, original italics; *Villatoro*, *supra*, at p. 1164.) Justice Perren felt the *Villatoro* instruction should be used for "the admissibility of uncharged offenses against the victim as proof of propensity under Evidence Code section 1108." (*Gonzales*, *supra*, at p. 507.).

Here, the jury was instructed under CALCRIM No. 1191 that they could consider evidence of *uncharged* crimes at the preponderance of evidence standard, which "courts

65.

have understood that [Evidence Code section 1108] at least allows admission of evidence of uncharged sexual offenses to show a propensity to commit sexual offenses." (*Cruz*, *supra*, 2 Cal.App.5th at p. 1185; *People v. Fitch, supra,* 55 Cal.App.4th at pp. 177–178, 181–182; *Falsetta, supra,* 21 Cal.4th at pp. 917–918; *People v. Reliford, supra,* 29 Cal.4th at pp. 1012–1013; *People v. Villatoro, supra,* 54 Cal.4th at p. 1160.) The court also instructed the jury as in *Villatoro* that it must prove beyond a reasonable doubt that the defendant committed one or more of the charged sexual offenses before considering defendant was disposed or inclined to commit the other sexual offenses. We decline to extend the *Villatoro* instruction to cover evidence of uncharged sexual offenses. Therefore, the trial court did not err in instructing the jury. (See *Villatoro*, *supra*, at pp. 1167–1168 [CALCRIM No. 1191 is the pattern instruction for uncharged offenses].)

Even if the court erred in instructing the jury with CALCRIM No. 1191, defendant cannot show he was prejudiced. CALCRIM No. 1191 does not lower the standard of proof required for the determination of guilt for defendant's charged offenses. (See *Gonzales*, *supra,* 16 Cal.App.5th at p. 507, conc. opn. of Perren J.; c.f. *Cruz*, *supra*, 2 Cal.App.5th at p. 1186.) The court's instructions made it clear that the charged offenses had to be proven beyond a reasonable doubt. (See *Gonzales*, *supra,* at p. 507; see *Winbush, supra,* 2 Cal.5th at p. 457 [we presume the jury followed those instructions].) Further, as discussed *ante,* the convictions were supported by detailed testimony from multiple victims regarding defendant's sexual abuse. Accordingly, defendant fails to demonstrate a reasonable probability the jury would have reached a different verdict had the court instructed the jury with a modified CALCRIM No. 1191. (See *Falsetta*, *supra*, 21 Cal.4th at p. 925.) As such, defendant's claim fails.

## DISPOSITION

We affirm the judgment.

FRANSON, J.

WE CONCUR:


HILL, P. J.


SMITH, J.